No. 99-375

IN THE SUPREME COURT OF THE STATE OF MONTANA

2000 MT 362

303 Mont. 364

15 P. 3d 948

S.L.H.,

Petitioner and Appellant,

v.

STATE COMPENSATION MUTUAL INSURANCE FUND,

Respondent and Respondent/Insurer for

THIRSTY'S BAR,

Employer.

APPEAL FROM: Workers' Compensation Court, State of Montana

The Honorable Mike McCarter, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Sara R. Sexe; Marra, Wenz & Johnson, Great Falls, Montana

For Respondent:

William O. Bronson; James, Gray, Bronson & Swanberg

Great Falls, Montana

For Amicus:

Larry Howell, Attorney at Law, Missoula, Montana (for Montana Trial

Lawyers Association)

Submitted on Briefs: January 6, 2000

Decided: December 28, 2000

Filed:

_____

Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1 S.L.H. filed a petition with the Workers' Compensation Court to resolve a dispute regarding disability benefits, medical benefits and the State Compensation Mutual Insurance Fund's (State Fund) subrogation claim. S.L.H. now appeals the court's findings that she had a 1% mental impairment rating; that her time of injury job was medium-duty; and that certain of the State Fund's actions did not entitle S.L.H. to an award of penalties, attorney fees, and costs. Montana Trial Lawyers Association (MTLA) filed an *amicus* brief limited to the mental impairment rating issue. The State Fund has not appealed any of the court's findings. We affirm in part and reverse in part.

¶2 We restate the issues as follows:

¶3 I Did the court err when it held that Dr. Evans' inability to express her evaluation of S.L.H.'s mental impairments as a percentage was fatal to S.L.H.'s claim?

¶4 II Did the court err in determining that S.L.H.'s time of injury job was medium duty rather than heavy duty?

¶5 III Did the court err in its decisions regarding penalties, attorney fees, and costs?

## Procedural and Factual Background

¶6 In November, 1991, S.L.H. was kidnaped from her job as a bartender and severely beaten and raped. At the time of the attack, S.L.H.'s employer was enrolled in a compensation plan and insured by the State Fund. While the State Fund accepted liability for S.L.H.'s injuries, the parties have disputed certain medical costs, S.L.H.'s wage loss and permanent mental impairments. As a result of these disagreements, S.L.H. filed a petition for hearing with the Workers' Compensation Court.

¶7 S.L.H.'s psychiatrist, Dr. Mary Ann Evans, diagnosed S.L.H. with post-traumatic stress disorder and major depressive disorder, and evaluated S.L.H.'s impairments according to the American Medical Association's "Guides to the Evaluation of Permanent Impairment." (*AMA Guides*). Both the third edition of the *AMA Guides*, in effect at the time of the assault, and the fourth edition, in effect at the trial, evaluate mental impairments under a five-class rating system, ranging from no impairment (Class 1) to extreme impairment (Class 5). Dr. Evans testified that S.L.H.'s post-traumatic stress disorder fell within Class 3 as a moderate impairment while her major depressive disorder fell between Class 3 and Class 2, and was therefore a moderate to mild impairment.

¶8 S.L.H.'s neurologist referred her to Dr. Patrick Galvas for a physical impairment rating. Although Dr. Galvas is neither a psychologist nor a psychiatrist, and was asked to evaluate only S.L.H.'s physical impairment, he provided a mental impairment evaluation as well.

¶9 Dr. Evans testified at the hearing that S.L.H.'s mental impairments were mild-to-moderate, falling between Classes 2 and 3 according to the *AMA Guides*. The court read § 39-71-711, MCA, which provides the procedure for rating impairments, as requiring that an impairment rating be expressed by the evaluator as a percentage. The court consequently asked Dr. Evans to provide the court with a percentage for S.L.H.'s mental impairments. Abiding by the *AMA Guides*' warning that "because no data exist that show the reliability of the impairment percentages, it would be difficult for Guides' users to defend their use in administrative hearings," Dr. Evans refused to translate S.L.H.'s mental impairment evaluation into a percentage. The Workers' Compensation Court did not question the accuracy and validity of Dr. Evans' evaluation and in fact the court concluded that S.L.H. suffered "severe psychological injuries." Although Dr. Evans' testimony sufficed to establish a mental impairment under the current *AMA Guides*, the court held it was insufficient to satisfy the percentage requirement in § 39-71-711(1)(c), MCA.

¶10 Dr. Galvas, on the other hand, in contravention of the *AMA Guides*' admonishment, but in compliance with § 39-71-711(1)(c), MCA, expressed his ratings of S.L.H.'s mental impairments as percentages: 1% for her post-traumatic stress disorder and 0% for her major depressive disorder.

¶11 Relying on Dr. Galvas' impairment ratings, which were the only percentages provided by an impairment evaluator, the court found that S.L.H. suffered a 1% permanent mental impairment rating.

¶12 In September of 1998, a vocational consultant analyzed S.L.H.'s job, as it existed at the time of the assault and concluded that S.L.H.'s bartending job was medium duty. S.L.H. did not object to introduction of the job analysis as an exhibit at trial, but both S.L.H. and her mother testified that the job, as it existed in 1991, was a heavy-duty job. The court concluded that S.L.H.'s time of injury job was medium duty.

## Standard of Review

¶13 We review the Workers' Compensation Court's conclusions of law to determine if they are correct. Russette v. Chippewa Cree Housing Auth. (1994), 265 Mont. 90, 874 P.2d 1217. The Court reviews questions of fact to determine if substantial credible evidence in the record supports them. Wunderlich v. Lumbermens Mut. Cas. Co. (1995), 270 Mont. 404, 892 P.2d 563. We will not substitute our judgment for that of the trial court where conflicting evidence, weight to be given witnesses' testimony, or their credibility is at issue. Burns v. Plum Creek Timber Co. (1994), 268 Mont. 82, 84, 885 P.2d 508, 509.

¶14 This Court will not rule on the constitutionality of a statute if we can decide a case without addressing constitutional concerns. Wolfe v. Montana Dep't of Labor & Indus. (1992), 255 Mont. 336, 339, 843 P.2d 338, 340. Because this issue can be decided without reaching constitutional concerns, we decline to address the appellant's constitutional arguments.

## Discussion

¶15 I Did the court err when it held that Dr. Evans' inability to express her evaluation of S.L.H.'s mental impairments as a percentage was fatal to S.L.H.'s claim?

¶16 Statutory construction is a "holistic endeavor" and must account for the statute's text,

language, structure, and object. United States Nat'l Bank v. Indep. Ins. Agents of Am., Inc. (1993), 508 U.S. 439, 455, 113 S.Ct. 2173, 2182, 124 L.Ed.2d 402, 418 (internal quotations omitted). Our purpose in construing a statute is to ascertain the legislative intent and give effect to the legislative will. Section 1-2-102, MCA.

¶17 We discern the intent of the legislature from the text of the statute if the words are clear and plain. Western Energy Co. v. State, Dep't of Revenue, 1999 MT 289, ¶ 11, 297 Mont. 55, ¶ 11, 990 P.2d 767, ¶ 11 (citation omitted). To avoid an absurd result and to give effect to a statute's purpose, we read and construe the statute as a whole. Skinner Enterprises, Inc. v. Lewis and Clark County Board of Health (1997), 286 Mont. 256, 274, 950 P.2d 733, 744.

¶18 S.L.H. and Amicus contend that the Workers' Compensation Court erred in its interpretation of § 39-71-711, MCA, and that this interpretation led to an absurd result in the context of mental impairments. Prescribing the procedure for determining an impairment rating for use in calculating an injured worker's disability award, § 39-71-711, MCA, provides:

> (1) An impairment rating:
>
>> (a) is a purely medical determination and must be determined by an impairment evaluator after a claimant has reached maximum healing;
>>
>> (b) must be based on the current edition of the Guides to Evaluation of Permanent Impairment published by the American medical association; and
>>
>> (c) must be expressed as a percentage of the whole person.

¶19 The Workers' Compensation Court interpreted the statute to require that the impairment evaluator, who determines the impairment rating, as required by subsection (a) must also satisfy each of the other two subsections of § 39-71-711, MCA. S.L.H. and MTLA argue that this creates an internal inconsistency because an impairment evaluator, under the current *AMA Guides* (since 1988) can no longer satisfy both subsection (b) and subsection (c) in the context of a mental impairment.

¶20 The *AMA Guides*, in both the third and fourth editions, specifically advise practitioners against the use of percentages for mental impairments. The fourth edition of

the *AMA Guides* admonishes:

> There is no available empiric evidence to support any method for assigning a percentage of impairment of the whole person . . . . Translating these guidelines for rating individual impairment on ordinal scales into a method for assigning percentage of impairments . . . cannot be done reliably . . . . The use of percentages implies a certainty that does not exist . . . .

*AMA Guides 300-01 (4th ed. 1993).*

¶21 According to the court's interpretation, the statute requires the *evaluator* to express her evaluation of impairment as a percentage. Although the court accepted Dr Evans' evaluation when it found "[t]he assault and rape resulted in severe physical and psychological injuries to the claimant," the court nonetheless concluded that S.L.H.'s claim failed "since she could not establish a percentage rating under the AMA Guides to impairment." We conclude that the court erred when it required that Dr. Evans translate her evaluation into percentages before the court would consider the evaluation for impairment rating purposes.

¶22 A. Was the court's interpretation required under the plain language of the statute?

¶23 In effect, the Workers' Compensation Court held that subsection (a)'s language that the impairment "must be determined by an impairment evaluator" means that to satisfy subsection (c), the *evaluator* must express the impairment as a percentage. However, the statute contains no express language stating who must translate the impairment evaluation into a percentage.

¶24 Subsections (a), (b) and (c) are subordinate to and modify the words "[a]n impairment rating" that precede them in section (1). None of the three subsections is subordinate to or modified by the other subsections, but rather each is independent of the others. The requirement found in subsection (c) that an impairment be expressed as a percentage is distinct from subsection (a)'s requirement that the impairment be a "purely medical determination . . . by an impairment evaluator." Reading the impairment evaluator requirement of subsection (a) into subsection (c) violates a primary rule of construction: a court's role is "not to insert what has been omitted or to omit what has been inserted." Section 1-2-101, MCA. Under its interpretation, the Workers' Compensation Court inserted an additional requirement into subsection (c), namely that the *evaluator* be the

one translating the evaluation into a percentage.

¶25 The court's interpretation asked Dr. Evans to do the impossible, both express mental impairments as a percentage as required by subsection (c), and base her evaluation, as required by subsection (b), on the current *AMA Guides*, which proscribes the use of percentages to express mental impairments. While § 39-71-711, MCA, requires that an impairment be expressed as a percentage and be based on the *AMA Guides*, it does not specifically require that the evaluator be the one translating the impairment evaluation into a percentage.

¶26 Had S.L.H. litigated prior to 1988, while the second edition of the *AMA Guides* was current, the interpretation of § 39-71-711, MCA, employed by the Workers' Compensation Court would have allowed compensation for S.L.H.'s mental impairments. But in 1998, S.L.H. was denied an award for her mental impairments, not because of any change in the statute, but because the AMA revised its *AMA Guides*, proscribing the use of percentages for evaluations of mental impairments. Although the court's interpretation may have been reasonable when the *AMA Guides* allowed a doctor to translate an impairment evaluation into a percentage, the statute does not *require* this interpretation, particularly now that it creates a result plainly at variance with the policy of the legislation as a whole. We hold that the court's interpretation was not required by the statute. The court could have reached a more reasonable result and furthered the legislative intent by examining the plain language of the statute for a more reasonable alternative.

¶27 When more than one interpretation is possible, in order to promote justice, we will reject an interpretation that leads to an unreasonable result in favor of another that will produce a reasonable result. Johnson v. Marias River Elec. Cooperative (1984), 211 Mont. 518, 687 P.2d 668. An alternative reading of the statute that leads to a more reasonable result and also abides by its grammatical structure is that the percentage required by subsection (c) is independent of subsection (a) and can be expressed by the workers' compensation judge, rather than only by the impairment evaluator. The statute allows the judge to translate into a percentage the evaluator's medical determination of impairment.

¶28 Under this alternative interpretation, the judge himself, in S.L.H.'s case, could have translated Dr. Evans' evaluation of a mild-to-moderate mental impairment into a percentage in order to comply with the statute. This would have avoided the absurd result caused by interpreting the statute as the court did, and would have furthered the legislative intent of compensating workers for physical injuries suffered on the job.

¶29 At the time subsection (c) of § 39-71-711, MCA, was enacted, it was redundant as it merely repeated the percentage requirement included in the *AMA Guides* referenced in subsection (b). Since the publishing of the third and fourth editions, which admonish against the use of percentages, subsection (c) has made § 39-71-711, MCA, internally incoherent. Although this Court is wary of expanding the judge's role, we must make sense of this statute. In order to do so, we conclude that when an evaluation is made by a medical evaluator according to the *AMA Guides*, the statute does not prohibit a judge from translating that evaluation into a percentage so that the injured worker may be compensated as envisioned by the legislation. We further recommend that the legislature delete subsection (c) so that the statute is coherent and so that a physician can comply with both the *AMA Guides* and § 39-71-711, MCA, when providing an impairment evaluation for compensation purposes.

¶30 B. Does the legislative purpose support the Workers' Compensation Court's interpretation?

¶31 Generally, courts should apply the plain meaning of legislation, however when "the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters . . . . [T]he intention of the drafters, rather than the strict language, controls." United States v. Ron Pair Enter. (1989), 489 U.S. 235, 242, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290, 299 (citation omitted). "Where there are several provisions or particulars, such a construction is, if possible, to be adopted as will give effect to all." Section 1-2-101, MCA.

¶32 In this case, the legislature expressly enunciated its intention in § 39-71-105, MCA:

> (1) It is an objective of the Montana workers' compensation system to provide, without regard to fault, wage supplement and medical benefits to a worker suffering from a work-related injury or disease.

¶33 The legislature's objective in enacting these statutes was to compensate workers for valid impairments resulting from injuries suffered on the job. While the legislative history provides little insight, clearly the requirements for establishing impairments are intended to ensure that the level of impairment is determined by a scientifically sound method, using objective medical findings.

¶34 In 1987, the legislature amended the definition of injury in §39-71-119, MCA, to

exclude compensation for claims resulting from non-physical injuries. We have previously held that excluding workers' compensation for mental or stress claims occurring without a physical component is constitutional as it rationally relates to the legitimate governmental objective of controlling the costs of the workers' compensation program in order to continue providing benefits. Stratemeyer v. Lincoln County (1993), 259 Mont. 147, 154, 855 P.2d 506, 511. In 1993, the legislature amended the public policy statement, § 39-71-105, MCA, so that it mirrored the injury definition, and expressly precluded awards for claims resulting from non-physical injuries. In this second amendment, the legislature wanted to insure that the judiciary understood the legislature's intent to exclude from compensation claims for injuries that occurred *without* a physical component. Legislative history indicates that the concern was for the potential cost of compensating stress claims. Although the legislature considered the issue of mental injury claims, and amended the statutes two separate times, nothing in the legislative history so much as hints at an intent to preclude compensation for mental claims resulting from *physical* injuries.

¶35 The second edition of the *AMA Guides* which was current in 1987, when § 39-71-711, MCA, was enacted, allowed physicians to express mental impairments as percentages. The legislation, as drafted, echoed the language then present in the *AMA Guides*. While the second edition of the *AMA Guides* was in effect, workers could be compensated for mental impairments pursuant to the statutory interpretation employed by the Workers' Compensation Court.

¶36 However, the third and fourth editions of the *AMA Guides* expressed a change in the AMA's policy by strongly advising against the use of percentages to express mental impairments. If it is assumed, as the Workers' Compensation Court did, that the *evaluator* must satisfy each of the subsections of § 39-71-711, MCA, this change in the *AMA Guides* created contradictory requirements in the statute. The statute requires that the evaluator base her evaluation on the *AMA Guides*. The statute also requires that the mental impairment evaluation be expressed as a percentage, which the *AMA Guides* advises against. An impairment evaluator cannot satisfy both subsections (b) and (c) of § 39-71-711 when evaluating mental impairments.

¶37 Under the court's interpretation then, when an evaluator abides by the *AMA Guides'* proscription against the use of percentages to express mental impairments, the injured worker is denied compensation. Such an interpretation is clearly at odds with the expressed intent of the legislation: "to provide . . . wage supplement and medical benefits to a worker suffering from a work-related injury . . . . " Section 39-71-105(1), MCA.

¶38 The expressed objective of the legislation requires that the court employ a different interpretation, one that creates a more reasonable result. The legislation allows a judge to translate the medical evaluation into a percentage so that a worker can be compensated for impairments resulting from physical injuries suffered on the job, as was intended by the legislature. We therefore reverse the court's finding regarding mental impairment and remand so that the Workers' Compensation Court can assign a percentage based on the evidence in the record for S.L.H.'s mental impairment.

¶39 II Did the court err in determining that S.L.H.'s time of injury job was medium duty rather than heavy duty?

¶40 This issue involves the specifications for medium and heavy labor as delineated in § 39-71-703(6), MCA:

> (a) "heavy labor activity" means the ability to lift over 50 pounds occasionally or up to 50 pounds frequently;
>
> (b) "medium labor activity" means the ability to lift up to 50 pounds occasionally or up to 25 pounds frequently[.]

¶41 Asserting that the judge's decision that her 1991 job was medium duty was based on insubstantial credible evidence, S.L.H. claims the only credible evidence regarding her time-of-injury job was the testimony provided by herself and her mother. S.L.H. argues that the job analysis did not accurately reflect the nature of the job as it existed in 1991, and can therefore provide no credible support for the court's decision. S.L.H. now complains that the State Fund's delay in getting the job analysis resulted in a faulty analysis, and that S.L.H. had too little time, only nine days before trial, to procure an expert of her own. However, S.L.H. did not raise these issues at trial and cannot now raise them on appeal. In re Marriage of Pearson, 1998 MT 236, ¶ 63, 291 Mont. 101, ¶ 63, 965 P.2d 268, ¶ 63. At trial, S.L.H. did challenge the accuracy of the job analysis and we will review the lower court's decision that S.L.H.'s time-of-injury job was medium duty.

¶42 We review a Workers' Compensation Court's findings of fact to determine if substantial credible evidence in the record supports them. *Wunderlich*, 270 Mont. at 408, 892 P.2d at 566. We have defined substantial evidence as "evidence that a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Swain v.

Battershell, 1999 MT 101, ¶ 34, 294 Mont. 282 ¶ 34, 983 P.2d 873, ¶ 34 (citation omitted). We will not substitute our judgment for that of the trial court where conflicting evidence, weight to be given witnesses' testimony, or their credibility is at issue. *Burns*, 268 Mont. at 84, 885 P.2d at 509. Although the evidence on this issue is conflicting, we conclude it is sufficiently substantial to support the court's finding that S.L.H.'s 1991 job was medium duty.

¶43 S.L.H. argues that the job analysis completed in 1998 did not in fact provide any meaningful analysis of her 1991 job and should not have been relied upon by the judge. At trial, S.L.H.'s attorney questioned whether the 1998 analysis even related to the job as it existed in 1991. The vocational consultant, Micki Marion Breedlove (Breedlove) twice replied that S.L.H.'s employer had been specifically asked to describe the 1991 job as it existed when S.L.H. was employed as a bartender. The employer's description, along with the analyst's observations and measurements at the bar, formed the basis for the final job analysis.

¶44 The analysis indicated that the 1991 job required S.L.H. to: 1) occasionally stock cases of beer that weighed 31 pounds; 2) rarely, about once a week, move a keg of beer into the cooler which required the exertion of between 35 and 37 pounds; and 3) "once in a while" remove garbage which weighed between 25-30 pounds. Breedlove testified that while S.L.H. may have been required to control the crowd, that duty did not involve any sort of physical exertion, but consisted only of sharp verbal warnings, and when necessary, telephone calls to the police. She further testified that in 1991 the bar employed a barback who helped with the stocking responsibilities, decreasing the frequency with which S.L.H. would have had to lift cases of beer.

¶45 S.L.H. and her mother testified that S.L.H.: 1) *frequently* stocked cases of beer; 2) twice nightly moved kegs of beer into the cooler; 3) physically restrained people from fighting; and 4) emptied garbage cans into an outside dumpster two or three times a night. S.L.H.'s mother also testified that she had observed her daughter move a keg, but did not know its size. She testified that she could not see how her daughter moved the keg and did not know if S.L.H. lifted the keg to place it in the cooler.

¶46 The judge evaluated the conflicting evidence, weighed the witnesses' testimony and credibility, and concluded that the 1991 job consisted of lifting up to 50 pounds occasionally or up to 25 pounds frequently which placed her job within the bounds of medium-labor activity as prescribed by statute. We hold that the Workers' Compensation

Court's conclusion is supported by substantial credible evidence and affirm the finding that S.L.H.'s time-of-injury job was medium duty.

¶47 III Did the court err in its decisions regarding penalties, attorney fees, and costs?

¶48 Resolution of these issues involves the application of two statutes: § 39-71-2907 and § 39-71-612, MCA, to each of several issues which we will address individually. The Court must determine whether a workers' compensation claimant is entitled to penalties and attorney fees pursuant to the statutes in effect on date of the claimant's injury. Madill v. State Comp. Ins. Fund (1997), 280 Mont. 450, 458, 930 P.2d 665, 670. Because S.L.H. was injured in November of 1991, we will apply the 1991 statutes.

¶49 Pursuant to § 39-71-2907, MCA, the judge may increase by twenty percent, the benefits due a claimant during a period of delay or refusal to pay when:

> (a) the insurer agrees to pay benefits but unreasonably delays or refuses to make the agreed-upon payments to the claimant; or

> (b) prior or subsequent to the issuance of an order by the . . . judge granting a claimant benefits, the insurer unreasonably delays or refuses to make the payments.

Section 39-71-2907, MCA (1991).

¶50 The determination of whether an insurer unreasonably delayed or refused to make payment is a question of fact, which we will review to ascertain if it is supported by substantial evidence. Stordalen v. Ricci's Food Farm (1993), 261 Mont. 256, 258, 862 P.2d 393, 394. We have repeatedly held that insurers have an affirmative duty to investigate workers' compensation claims and that absent such an investigation, the denial of a claim for benefits is unreasonable. Marcott v. Louisiana Pacific Corp. (1996), 275 Mont. 197, 210, 911 P.2d 1129, 1137; Stevens v. State Comp. Mut. Ins. Fund (1994), 268 Mont. 460, 467, 886 P.2d 962, 966 (*overruled on other grounds by* Kloepfer v. Lumbermens Mut. Cas. Co. (1995), 272 Mont. 78, 899 P.2d 1081); Lovell v. State Comp. Mut. Ins. Fund (1993), 260 Mont. 279, 288, 860 P.2d 95, 101.

¶51 Costs and attorney fees may be assessed against an insurer by a workers' compensation judge when: 1) there is a payment or written offer of payment; 2) there is a controversy relating to the amount of compensation due; 3) the claim is brought before the

court for adjudication; and 4) the judge's award is greater than that offered by the insurer. Section 39-71-612, MCA (1991). When the conditions for an award of attorney fees pursuant to § 39-71-612 are satisfied, the award of attorney fees and costs to the claimant is *not* discretionary. *Madill*, 280 Mont. at 462, 930 P.2d at 673.

¶52 We have held that "[p]ayment of unreasonably withheld benefits 'on the courthouse steps' does not negate the insurer's potential liability for a penalty for unreasonable delay of benefits. To conclude otherwise would render the 'unreasonable delay' provisions of the penalty statute moot." *Lovell*, 260 Mont. at 289, 860 P.2d at 102. S.L.H. urges this Court to apply the same reasoning in the context of the attorney fee statute that we have applied to penalty statute questions. S.L.H. points out that the term "unreasonable" becomes mere surplusage if the State Fund can deny benefits until the eve of the trial and never be required to pay the attorney fees its unreasonable behavior has necessitated.

¶53 The attorney fees statute however has two specific requirements that differ significantly from the penalty statute: 1) the issue must be brought before the court for adjudication; and 2) the judge must make an award of compensation greater than that offered by the insurer. In 1987, the legislature excised the word "settlement" from the attorney fees statutes, so that an award for fees is now precluded, despite potentially burdensome legal fees, if the insurer agrees to settle, even "on the courthouse steps." Although S.L.H. makes a good policy argument that our reasoning in *Lovell* might be appropriate for attorney fees assessment, the explicit language of the statute precludes such a reading. We therefore decline to adopt the *Lovell* reasoning in the context of the attorney fees and costs statute, § 39-71-612, MCA (1991).

## SUBROGATION

¶54 In this case, the State Fund, without investigation and with no factual or legal basis, claimed a right of subrogation to over $50,000. One week before trial, after claiming the subrogation right for over six months, the State Fund finally conceded the issue. Responding to the court's request for an explanation of the basis for the subrogation claim, the State Fund stated it "took the position that it would be the claimant's burden to establish that there was no subrogation interest to the Fund in this particular case." The court replied, "[s]o if the only factual basis was, you know, 'prove it to me and we will just sit back, and if we are not satisfied with your proof, we will continue to persist in our claim, even though we haven't done an independent analysis,' that's going to get a penalty . . . ."

¶55 In the end, however, the court awarded neither sanctions nor penalties, holding that "a claim for subrogation with respect to benefits *already* paid does not constitute benefits due," and therefore cannot give rise to penalties or attorney fees pursuant to §§ 39-71-2907 or 39-71-612, MCA. We agree.

56 ¶Although the definitions of "benefits" and "compensation" have been refined over the years, they have never been considered to include subrogation within their meaning. We have repeatedly held that the term "compensation" includes not only a worker's wage or salary, but also compensation for time off the job, for disability and for medical payments. Lockhart v. New Hampshire Ins. Co., 1999 MT 205, ¶ 16, 295 Mont. 467, ¶ 16, 984 P.2d 744, ¶ 16 (citation omitted). Although a judge may decide whether a subrogation claim is valid, or an insurer's actions reasonable, a judge awards no compensation in deciding a subrogation question. We decline to so stretch the definition of compensation as to allow the inclusion of subrogation, but we do agree with the Workers' Compensation Court and the appellant that the State Fund's actions in this case are worthy of sanction. Contrary to S. L.H.'s claim, §§ 39-71-2907 and 39-71-612, are not the only remedies for such conduct. In this case, S.L.H. could have moved for, or the court, *sua sponte*, could have imposed sanctions under § 39-71-2914, MCA (1991).

¶57 The Workers' Compensation Court's corollary to Rule 11 of the Montana Rules of Civil Procedure provides that an attorney's or party's signature on a petition, pleading, motion or any other paper certifies that the paper is: 1) well grounded in fact, after reasonable inquiry; 2) warranted by existing law or a good faith argument for modification of existing law; and 3) not interposed for any improper purpose such as to harass or cause unnecessary delay. Section 39-71-2914, MCA (1991). Noting that S.L.H. had not moved for sanctions, the court explained that although the penalty and attorney fees statutes could not apply to subrogation claims, a claimant has recourse against unreasonable actions through the sanction statute.

¶58 The statute requires that "[i]f a . . . paper is signed in violation of this section, the court , upon motion, or upon its own initiative*, shall* impose an appropriate sanction upon the person who signed it, a represented party, or both." Section 39-71-2914(4), MCA (1991) (emphasis added). Although § 39-71-2914, MCA, permits the judge discretion to choose *appropriate* sanctions, the imposition of sanctions is not discretionary. When a judge finds that § 39-71-2914 has been violated, the statute states that she *shall* impose sanctions upon the represented party, attorney or both. S.L.H. explains that she did not want to request sanctions against an attorney who began representing the State Fund only

five weeks before trial and had no part in pursuing the baseless subrogation claim. S.L.H. fails to note that sanctions may be imposed directly upon the party thereby avoiding punishment of an apparently innocent attorney. Contrary to S.L.H.'s contentions, sanctions would have been an appropriate punishment for the State Fund's baseless claim of subrogation which was submitted to the court in both the State Fund's response to S.L.H.'s petition and in the pretrial order of September 8, 1998.

¶59 All the evidence in the record indicates that the State Fund's assertion of a subrogation claim was not well grounded in fact as required by § 39-71-2914(3)(b), MCA. Furthermore, after receiving information from S.L.H. in May, 1998, the State Fund neither responded nor requested additional information, but rather waited until one week before trial to concede its claim. During this time, the State Fund's approach was that S.L.H. should disprove the State Fund's subrogation claim. Consequently, S.L.H. was required to expend resources in defending against the claim. After listening to the State Fund admit in court that it had no legal authority or factual theory to support its claim of subrogation, and that it had completed no investigation whatsoever to support its subrogation claim, the court, upon its own initiative, should have imposed sanctions against the State Fund for violation of § 39-71-2914, MCA. However, since S.L.H. does not raise the issue on appeal, we will not remand for imposition of sanctions. We affirm the court's holding that subrogation is not a benefit or compensation due and therefore the court could not award penalties or attorney fees pursuant to §§ 39-71-612 and 39-71-2907, MCA.

## GASTROINTESTINAL MEDICATION

¶60 S.L.H. suffered from recurring gastroesophageal reflux which became more severe in 1997. In response to the exacerbated condition, Dr. Dietrich requested authorization to prescribe Prevacid, a more expensive medication than previously had been prescribed. The State Fund's claims examiner initially denied payment and requested Dr. Dietrich's notes. Upon receipt of the notes, she continued to deny payment for the medication.

¶61 As mentioned earlier, absent at least a minimal investigation of a claim's validity, denial of a claim for benefits is unreasonable. *Lovell*, 260 Mont. at 288, 860 P.2d at 101. The claims examiner's investigation consisted solely of her request for Dr. Dietrich's office notes. In those notes, Dr. Dietrich stated "I would view this as an exacerbation of an underlying condition due to the stress, mostly all of which is connected in some way to her assault and subsequent problems." He also attributed the worsening of the condition to "the stress of the trial, the Workers' Compensation case, vocational rehabilitation, the

multitude of evaluations that she has had, the depositions, etcetera . . . ."

¶62 In its ruling, the court stated that "[i]n denying authorization for the . . . Prevacid, Hunt [the claims examiner] acted on her own without any medical consultation or advice (other than the advice supplied by Dr. Dietrich)." However, the court held that the denial was not unreasonable because the "State Fund's liability for the more expensive medication was reasonably debatable as it may be reasonably argued that the more costly medication is attributable to the stress of the impending trial, not to the injury . . . ."

¶63 S.L.H. contends that the State Fund had no medical evidence that the exacerbation of the condition, and the resultant need for different medication was not related to her injury.

¶64 The State Fund responds that S.L.H.'s treating physician, Dr. Dietrich, himself noted that the exacerbated condition was related to an upcoming trial of S.L.H.'s third-party claim against the manufacturer of the alarm system at her former employer's place of business. Relying on this opinion expressed by S.L.H.'s treating physician, the State Fund asserts that its denial of payment for the medication was not unreasonable.

¶65 In this case, although the claims examiner denied payment for medication prescribed by the claimant's treating physician, she did not "ignore" Dr. Dietrich's opinion. Rather, the claims examiner relied on the treating physician's notes in which the doctor stated that the exacerbation of the condition may have been attributable to an impending civil trial, rather than to her injury. A claims examiner cannot, without any medical consultation or advice, reasonably ignore the opinion of a claimant's treating physician and refuse to pay for medication prescribed by the treating physician. Plooster v. Pierce Packing Co. (1993), 256 Mont. 287, 846 P.2d 976. However, we cannot say that the notes from S.L.H.'s treating physician in this case were unequivocal.

¶66 The claims examiner here performed a very minimal investigation before denying payment, but she did complete some investigation, and the information she received from Dr. Dietrich was arguably sufficient to create a question as to the State Fund's liability for the exacerbation of S.L.H.'s reflux condition. Because there is substantial credible evidence, although not necessarily a preponderance, to support the Workers' Compensation Court's ruling that the State Fund had a reasonably debatable argument for denying payment for the more expensive medication, we affirm the court's decision that the State Fund's actions were not unreasonable and that S.L.H. was therefore not entitled to either penalties or attorney fees on that issue.

# WAGE LOSS

¶67 The court found that S.L.H. had suffered a twenty percent wage loss and assessed a penalty for unreasonable conduct. However, the court also held that the State Fund had a reasonable argument for denying ten percent of the twenty percent wage loss and consequently assessed a penalty for only ten percent of the wage loss. Although the judge initially awarded S.L.H. attorney fees for the unreasonable denial of ten percent of the wage loss, he later reversed himself and concluded that the State Fund had conceded the issue prior to trial and that an award of attorney fees was therefore precluded.

¶68 S.L.H. urges this Court to direct the Workers' Compensation Court to award both a penalty for the additional ten percent wage loss and attorney fees for the entire twenty percent wage loss. S.L.H. contends that the court's findings are based on factual inaccuracies. She claims that the court erred in finding that the State Fund did not act unreasonably in denying the entire twenty percent wage loss. S.L.H. also asserts that the State Fund did not concede a ten percent wage loss until the first day of trial and that she was required to litigate and present proof of the entire wage loss. Consequently, she argues, the court's finding that attorney fees could not be assessed because the State Fund conceded the issue prior to trial, is unsupported by substantial evidence in the record.

¶69 The State Fund responds that in this case, statutory interpretation was required before either party could know what might be a reasonable wage loss figure. The State Fund points to the order in which the judge explained that while § 39-71-703(3)(c), MCA (1991), speaks simply of a "wage loss of less than $2 or less an hour," the court was required to consider the claimant's inability to work full time and how that would impact the figuring of wage loss. The State Fund defends the court's decision not to award attorney fees by pointing again to the court's order in which the judge finds that, because the State Fund conceded the initial ten percent wage loss prior to trial, the court did not adjudicate the issue and S.L.H. was therefore not entitled to attorney fees.

¶70 In light of questions of legal interpretation relating to the ability to work full time or part time and how that relates to wage loss, the court's factual finding that the State Fund acted unreasonably only as to the initial ten percent wage loss was supported by substantial evidence in the record. We therefore affirm the court's ruling that a penalty pursuant to § 39-71-2907, MCA, was appropriate only for the initial ten percent wage loss.

¶71 As discussed above, the attorney fees statute requires that the case be brought before

the judge for adjudication, that a judge award an amount greater than that initially offered by the insurer, and that a judge find the insurer's actions unreasonable before attorney fees may be assessed pursuant § 39-71-612, MCA. We have held that when a party concedes an issue in the opening statement of a trial, the issue remains in controversy into the adjudication phase, and attorney fees and costs may be assessable for that issue. Krause v. Sears Roebuck & Co. (1982), 197 Mont. 102, 641 P.2d 458.

¶72 In the case at hand, the court found the State Fund conceded a ten percent wage loss prior to trial. The transcript, however, reveals that the State Fund explicitly declined to concede the issue on the first day of trial:

> MR. BRONSON: But as we have read the medical evidence, there is no indication that she is going to be absolutely barred from eventually performing some kind of full-time work. Perhaps at wages that are identical to, if not greater than what she was earning at the time of injury.
>
> . . . .
>
> And I hesitate to have a situation where we decide automatically that she is entitled to a wage loss simply because of the limited experience so far in doing some part-time work, when there is some potential for full-time work and none of her medical providers are discouraging her from eventually getting into full-time work.
>
> THE COURT: Yes. But you are not- I mean, even under that analysis, isn't she due some benefits for her current situation, where she is not working full-time?
>
> MR. BRONSON: My-
>
> THE COURT: You are basically offering her nothing.
>
> MR. BRONSON: My concern, Your Honor, is that I think it should be left open-ended for a reasonable period of time here.
>
> THE COURT: And you would pay her nothing?
>
> MR. BRONSON: For wage loss.
>
> THE COURT: Even though she currently does have a wage loss.

MR. BRONSON: That's correct.

¶73 This discussion between the State Fund and the judge at trial clearly shows that the State Fund had not conceded any wage loss prior to trial. The only evidence to suggest that the State Fund made any concession prior to trial consists of a statement by S.L.H.'s attorney that the State Fund's previous attorney had orally admitted a ten percent wage loss. However, the attorney who represented the State Fund at trial maintained the State Fund's denial of any wage loss payment. Furthermore, the State Fund made no wage loss payments prior to trial, and made no attempt to refute S.L.H.'s opening statement in which she stated: "the State Fund has persisted in saying that she is entitled to no benefits for her wage loss." Additionally, although both the court and S.L.H. listed and discussed the conceded issues, (the subrogation claim, the MRI/EMG, the gastrointestinal medication, and the physical restriction), neither referred to the wage loss as a conceded issue.

¶74 Looking to the substance of the trial, it is clear that the wage loss issue remained in controversy into the adjudication phase of the proceedings. S.L.H. was required to litigate the issue, presenting witnesses and proof of her wage loss at trial, before the judge awarded her a twenty percent wage loss. S.L.H. submitted proof on the issue, the State Fund argued against any wage loss, and the Workers' Compensation Court entered a conclusion of law and a finding of fact regarding the entire wage loss and the State Fund's unreasonable actions. We find that the record provides no substantial credible evidence to support the Workers' Compensation Court's finding that the State Fund conceded any wage loss prior to trial. We therefore reverse the court's denial of attorney fees and remand for a determination of reasonable attorney fees and costs in relation to S.L.H.'s proof of the initial ten percent wage loss.

## MRI/EMG

¶75 The workers' compensation judge found that the denial of payment for the two diagnostic tests requested by S.L.H.'s treating physician was unreasonable and assessed a penalty against the State Fund, but declined to award attorney fees and costs on the issue.

¶76 S.L.H. again urges this Court to adopt a more flexible approach to assessing attorney fees and costs. As stated earlier, the language in § 39-71-612, MCA, explicitly providing that attorney fees are assessable only when the issue has been brought before the court for adjudication, precludes a court from assessing attorney fees when a party has conceded an

issue prior to trial. The parties and the court agree that the MRI/EMG dispute had been conceded prior to trial and although the judge awarded a penalty and warned against "second-guessing the treating physician, unless you have got some medical backup for it," the judge could not award attorney fees. We affirm the court's decision that attorney fees and costs could not be assessed against the State Fund for its unreasonable actions regarding the MRI and EMG tests, as the dispute was resolved prior to trial.

## PHYSICAL RESTRICTION

¶77 The court ruled that S.L.H. was restricted to light-duty activity and that because her time-of-injury job had been a medium-duty position, she suffered a ten percent physical restriction. The court awarded a twenty percent penalty pursuant to § 39-71-2907, MCA, after finding that the State Fund unreasonably delayed determination of S.L.H.'s physical restriction. However, because the State Fund conceded the restriction issue prior to trial, albeit apparently "on the courthouse steps," the court could not assess attorney fees against the State Fund.

¶78 The record supports the finding that the State Fund conceded the issue prior to trial. S.L.H., the judge, and the State Fund all refer to the ten percent restriction as conceded prior to the commencement of the trial. We therefore affirm the Workers' Compensation Court's ruling that attorney fees could not be awarded on the restriction issue.

/S/ W. WILLIAM LEAPHART

We concur:

/S/ J. A. TURNAGE

/S/ JIM REGNIER

/S/ TERRY N. TRIEWEILER

/S/ JAMES C. NELSON

/S/ KARLA M. GRAY

Justice William E. Hunt, Sr., did not participate.