No. 02-043

IN THE SUPREME COURT OF THE STATE OF MONTANA

2003 MT 213

EULA MAE HIETT,

Petitioner and Appellant,

v.

MISSOULA COUNTY PUBLIC SCHOOLS,

Respondent/Insurer/Employer.

APPEAL FROM: Workers' Compensation Court, Cause No. WCC 2001-0278
State of Montana
The Honorable Mike McCarter, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Sydney E. McKenna (argued),Tornabene & McKenna, Missoula,
Montana

For Respondent:

Leo S. Ward (argued), Kimberly L. Towe, Browning, Kaleczyc, Berry
& Hoven, Helena, Montana

For Amicus Montana Trial Lawyers' Association:

Patrick R. Sheehy (argued), Halverson, Sheehy & Plath, Billings, Montana

Heard: October 10, 2002
Submitted: October 29, 2002
Decided: August 14, 2003

Filed:

_____
Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1 Eula Mae Hiett (Hiett) appeals the Workers' Compensation Court's (WCC) determination that she was not entitled to payment for certain prescription drugs. We affirm in part and reverse and remand in part.

¶2 Hiett presents one issue on appeal--did the WCC err when it determined that she was not entitled to payment for prescription drugs necessary to control pain and depression resulting from her compensable back injury?

### FACTUAL AND PROCEDURAL BACKGROUND

¶3 On March 1, 1996, Hiett, then 59 years old, had been working for sixteen years as a custodian for the Missoula County Public Schools (School District). On this day, she lifted a 30-gallon trash can and suffered compression fractures of her T6 and T8 thoracic vertebrae.

¶4 At the time of the injury, the School District was a member of a school self-insurance pool known as Montana Schools Group Insurance Authority (MSGIA). MSGIA accepted liability for Hiett's condition and paid disability and medical benefits. Hiett sought treatment from Dr. Sable who found her to be at maximum medical improvement (MMI) in June 1996. Hiett was permanently restricted to sedentary to light-duty work.

¶5 In July 1996, Hiett returned to work as a part-time custodian with modified duties. This work, however, aggravated her back pain and she was forced to stop. Shortly thereafter, Dr. Sable diagnosed her with anxiety and depression triggered by her inability to work as a custodian because of her work-related injury. He prescribed various medications

to address her anxiety and depression and MSGIA accepted liability for these medications. A psychiatrist also examined Hiett and concurred with Dr. Sable's conclusion.

¶6     In September 1996, Dr. Sable approved a number of jobs for Hiett. Based upon his determination that Hiett had reached MMI and his approval of a number of jobs, MSGIA terminated Hiett's temporary partial disability (TPD) benefits and tentatively calculated her permanent partial disability (PPD) at 26%, or $17,290.

¶7     Hiett was unable to obtain the desired School District job that had been approved by Dr. Sable because she was not qualified. A two-hour per day job was offered but she turned it down because it would have cost her more to get to and from work than she would have earned. A few other approved jobs were available during the last four months of 1996 but Hiett did not apply for them. In December 1996, the School District terminated Hiett's employment, effective January 3, 1997. Hiett then began receiving Social Security Disability (SSD) benefits retroactive to September 1996, and submitted her application for retirement to the Public Employees Retirement System.

¶8     Settlement negotiations began in January 1997, over Hiett's entitlement to PPD and rehabilitation benefits. Negotiations terminated in July 1997, with a settlement agreement under which Hiett received $27,930. The agreement closed rehabilitation benefits but reserved "further medical and hospital benefits." At no time prior to the settlement did MSGIA tell Hiett or her attorney that continued payment for medications was contingent upon Hiett obtaining employment.

3

¶9     At the time Hiett settled her claim she was not working nor, with the exception of the short-term modified custodial position in July 1996, had she worked since sustaining her March 1, 1996 injury. Subsequent to the settlement, she occasionally worked selling tickets at high school sporting events. She also worked from May 2000 to November 2000 as an assisted-living attendant at a retirement facility. However, she had to leave that job upon being hospitalized for drug withdrawal from medications she had been taking.

¶10    MSGIA paid for Hiett's pain medication from May 1996 until January 1999. It paid for her anti-depressants from August 1996 until January 1999. In January 1999, a new claims adjuster, Charles Edquest, took over Hiett's case file. Upon a review of the file, he concluded that Hiett's medications constituted "secondary medical services," and discontinued payment for these medications because Hiett was not working. Edquest did not contact Hiett to determine whether she was working at that time, nor did he notify her that he was discontinuing her prescription benefits. She learned that insurance was not paying for her medicine when, in the fall of 1999, she attempted to refill one of the prescriptions and was told there was a $1,600 bill outstanding with the pharmacist. She was then told that no insurance payment had been made for ten months.

¶11    Hiett's counsel contacted Edquest in early October 1999. Edquest then agreed to pay for Hiett's past prescriptions, in part because he had inadvertently failed to notify her that prescription benefits were to be discontinued. Several months passed, however, and the bills remained unpaid so Hiett requested mediation. After the first mediation, a $1,200 payment

4

for prescriptions was made. Other bills remained outstanding and Edquest offered administrative reasons for the delay but agreed once again to pay them.

¶12 Hiett was ultimately notified that MSGIA contested its obligation to pay for further medications because Hiett was not working. She requested a second mediation upon being told benefits were to be discontinued. The second mediation was postponed pending an opinion from Hiett's doctor that Hiett's medications were essential to her well-being and would allow her to work. Upon receipt of a letter to this effect in September 2000, at which time Hiett was working for the retirement facility, MSGIA agreed to pay for Hiett's medication for as long as she worked.

¶13 Some prescription bills still remained unpaid as of December 31, 2000; therefore, Hiett requested a third mediation. By this time, however, Hiett had left her job with the retirement facility. As a result, the parties could not reach agreement regarding Hiett's entitlement to further payment of prescriptions. MSGIA maintained its position that such benefits were "secondary" benefits and would be paid only while Hiett was employed. Hiett petitioned the Workers' Compensation Court. Pending the court's ruling, MSGIA agreed to continue paying for Hiett's injury-related medications.

¶14 At the trial before the WCC held on April 11, 2001, Hiett and Edquest both testified. On September 6, 2001, the WCC issued its Findings of Fact, Conclusions of Law and Judgment holding that Hiett was not entitled to payment for her prescription drugs unless the medications would enable her to return to employment and, once employed, enable her to continue working. The WCC also concluded that Hiett was entitled to a penalty with respect

5

to those benefits MSGIA agreed to pay but failed to pay within a reasonable time. The court's findings and conclusions will be discussed in further detail below.

## STANDARD OF REVIEW

¶15 This Court employs two standards of review for decisions of the Workers' Compensation Court: we review the findings of fact to determine if they are supported by substantial, credible evidence, and we review conclusions of law to determine if they are correct. *Geiger v. Uninsured Employers' Fund*, 2002 MT 332, ¶ 13, 313 Mont. 242, ¶ 13, 62 P.3d 259, ¶ 13 (citations omitted). In workers' compensation cases, the law in effect at the time of the claimant's injury establishes the claimant's substantive right to benefits. *State Compensation Ins. Fund v. McMillan*, 2001 MT 168, ¶ 6, 306 Mont. 155, ¶ 6, 31 P.3d 347, ¶ 6.

## DISCUSSION

¶16 Hiett advances several legal theories for her contention that the WCC erred in reaching its conclusion that she was not entitled to the prescription benefits she seeks, one of which is that the WCC misinterpreted and misconstrued the relevant statutory provisions. Because we resolve this case under the court's statutory interpretation, we need not address the other theories advanced by Hiett.

¶17 The Workers' Compensation Act (the Act), first enacted in 1915, provided for the "protection and safety of workmen in all places of employment and for inspection and regulation of places of employment . . . ." Chapter 96, Laws of Montana, 1915. Several revisions later, in 1987, the Legislature revised the public policy behind the law to include:

6

It is an objective of the Montana workers' compensation system to provide, without regard to fault, wage supplement and medical benefits to a worker suffering from a work-related injury or disease. . . .

Section 39-71-105(1), MCA (1995).

¶18 Despite its many changes, Montana's Act, like similar workers' compensation acts throughout the country, was primarily created to assure compensation and medical benefits to injured workers without requiring them to sue their employers and surmount a difficult burden of proof. We note as well that employers benefit from the Act in that it protects them from suits by injured employees and from potentially high damage awards.

¶19 In providing medical care benefits, the Act allows for payment of "primary medical services" and "secondary medical services." "Primary medical services" are defined as:

treatment prescribed by a treating physician, for conditions resulting from the injury, necessary for achieving medical stability.

Section 39-71-116(25), MCA (1995).

"Secondary medical services" are defined as:

those medical services or appliances that are considered not medically necessary for medical stability. The services and appliances include but are not limited to spas or hot tubs, work hardening, physical restoration programs and other restoration programs designed to address disability and not impairment, or equipment offered by individuals, clinics, groups, hospitals, or rehabilitation facilities.

Section 39-71-116(29)(a), MCA (1995).

"Medical stability," as used in the statutes above, is synonymous with "maximum healing" and "maximum medical healing" and means "a point in the healing process when further material improvement would not be reasonably expected from primary medical treatment."

7

Section 39-71-116(17), MCA (1995). As will be discussed below in further detail, the WCC concluded that medical stability was also synonymous with MMI. Such a conclusion is supported by authority from other jurisdictions. See, for example, *Dohl v. PSF Industries* (Idaho 1995), 899 P.2d 445.

¶20 The WCC was required to construe and interpret several provisions of § 39-71-704, MCA (1995), including the following:

> (1) In addition to the compensation provided under this chapter and as an additional benefit separate and apart from compensation benefits actually provided, the following must be furnished:

> (a) After the happening of a compensable injury and subject to other provisions of this chapter, the insurer shall furnish reasonable primary medical services for conditions resulting from the injury for those periods as the nature of the injury or the process of recovery requires.

> (b) The insurer shall furnish secondary medical services only upon a clear demonstration of cost-effectiveness of the services in returning the injured worker to actual employment.

> . . .

> (f) Notwithstanding subsection (1)(a), the insurer may not be required to furnish, after the worker has achieved medical stability, palliative or maintenance care except:
> (i) when provided to a worker who has been determined to be permanently totally disabled and for whom it is medically necessary to monitor administration of prescription medication to maintain the worker in a medically stationary condition; or
> (ii) when necessary to monitor the status of a prosthetic device.

> (g) If the worker's treating physician believes that palliative or maintenance care that would otherwise not be compensable under subsection (1)(f) is appropriate to enable the worker to continue current employment or that there is a clear probability of returning the worker to employment, the treating physician shall first request approval from the insurer for the treatment. If

8

approval is not granted, the treating physician may request approval from the department for the treatment. The department shall appoint a panel of physicians, including at least one treating physician from the area of specialty in which the injured worker is being treated, pursuant to rules that the department may adopt to review the proposed treatment and determine its appropriateness.

¶21 "Maintenance care," as used in § 39-71-704(1)(f), MCA (1995), above, is defined as "treatment designed to provide the optimum state of health while minimizing recurrence of the clinical status." Section 39-71-116(16), MCA (1995). "Palliative care" means "treatment designed to reduce or ease symptoms without curing the underlying cause of the symptoms." Section 39-17-116(20), MCA (1995).

¶22 In the case at bar, the WCC was asked to determine if Hiett, who reached maximum medical improvement in June 1996, is entitled to ongoing payments for prescription pain and depression medication. The court recognized in its Conclusions of Law that "the statutes regarding medical services are poorly written and raise extremely difficult questions of statutory interpretation." It observed that it was faced with a statutory construction dilemma --it could construe the statutes in a manner resulting in an absurd outcome, or insert language into the statute that was not put there by the legislature. The WCC ultimately concluded that, while seemingly absurd, there was no statutory authority for paying Hiett's prescriptions unless the prescriptions were either a cost-effective means of returning her to employment under § 39-71-704(1)(b), MCA (1995), or qualified as physician-requested palliative or maintenance care appropriate to enable her to return to work. Section 39-71-704(1)(g), MCA (1995).

9

¶23 Hiett maintains that this "absurd" result could have been avoided had the court interpreted the definition of "primary medical services" to include medical services designed to "maintain" medical stability.

¶24 In the WCC's statutory analysis, it painstakingly worked its way through the applicable statutes applying them to the facts in Hiett's case. The analytical path taken by the WCC is illustrative of the conundra the various statutes present, so we trace it here.

¶25 The court deconstructed the meanings of "primary medical services" and "medical stability," merged them into a single definition, and concluded that "medical stability" is "a point in the healing process when further material improvement would not be reasonably expected *from treatment necessary for achieving medical stability*." Recognizing that such a definition was circuitous, the WCC nonetheless felt constrained to conclude that once medical stability is *achieved*, no further medical treatment would materially improve a claimant's condition, and therefore any further treatment could not be considered "primary medical services." Having equated MMI with medical stability, the WCC concluded that Hiett's continuing medications beyond MMI were not primary medical services and could not be reimbursed as such.

¶26 Throughout its analysis, the WCC placed recurring emphasis on the word "achieving" as used in the statutory definition of "primary medical services" found in § 39-71-116(25), MCA (1995) ("treatment prescribed by a treating physician, for conditions resulting from the injury, necessary for *achieving* medical stability." (emphasis added)). Although the term "achieve" is not defined in the Act, the WCC felt constrained to conclude that once Hiett

reached (or "achieved") MMI, she was not entitled to continued coverage of prescription medications under the above provision because such primary services are defined as and limited to services "necessary for *achieving* medical stability."  In other words, once MMI is reached, the "achievement" is over.

¶27    The WCC fully realized that not all claimants who reach medical stability remain there, and that some actually deteriorate and require further treatment to again reach stability. The court hypothesized a situation where a claimant reaches medical stability through drug therapy, stops the therapy, and then, upon discontinuation of the drug therapy, relapses to non-MMI status.  In this instance, the court reasoned, the drugs would once again become a primary medical service.  This analysis led the WCC to this inquiry: "Does the primary-secondary services distinction require that claimant terminate drug therapy and relapse before the insurer is once again liable for the therapy?  Applying the primary services provision as written, it appears so, unless some other provision requires payment of medications once the worker has reached MMI."

¶28    The court then engaged in a detailed analysis of §§ 39-71-704(1)(b), (1)(f), (1)(g) and 39-71-116(29), MCA (1995), and concluded that none of these provisions were applicable to Hiett's circumstances.  It reasoned that § 39-71-704(1)(b), MCA (1995), requiring an insurer to furnish cost-effective secondary medical services designed to return an injured worker to employment, did not apply to Hiett's case "since [Hiett] has failed to demonstrate her medications will enable her to return to actual employment."  The WCC next parsed the definition of "secondary medical services," *i.e*., "those medical services . . . not medically

11

necessary for medical stability" (§ 39-71-116(29), MCA), noting that the definition did not include the word "achieving" but instead contained the phrase "medically necessary for medical stability." The WCC opined that "medically necessary for medical stability" incorporated both the concept of "achieving" medical stability and "maintaining" medical stability. The WCC determined that because Hiett's medications **were** necessary for her to maintain medical stability, her prescriptions were not "secondary medical services" either.

¶29 Ultimately the WCC concluded that there was simply no statutory authority authorizing payment for an injured worker's drug therapy after a worker has reached medical stability except "where the medications would return the claimant to employment or enable an employed claimant to continue working. § 39-71-704(1)(b) and (1)(g), MCA." As it was not contemplated that Hiett would return to employment, the court denied Hiett's claim.

¶30 We appreciate the WCC's in-depth analysis of the statutory scheme, and we agree with the court's view that the statutes are confusing and poorly written. We also agree with the court's determination that §§ 39-71-704(1)(b), (f), and (g), MCA (1995), do not apply to Hiett's situation. We disagree, however, with the WCC's conclusion of law that because Hiett has reached MMI she is not entitled to prescription benefits absent a return to employment.

¶31 Based on the definition of "medical stability" found at § 39-71-116(17), MCA (1995), we acknowledge that MMI is reached when the underlying condition has stabilized to the point that no further material improvement would be reasonably expected from primary medical treatment. However, the question presented here is *how or at what point* does one

12

"achieve" medical stability? The statutes do not tell us. Is it through the start-stop-start routine of medical services described by the court in its hypothetical, or is it through reaching and maintaining a plateau of stability? Since neither the statutes or our case law address this pivotal question, we must apply rules of statutory construction to determine what the legislature meant when it spoke in terms of a claimant "achieving" medical stability.

¶32    We have previously noted that "[w]hen more than one interpretation is possible, in order to promote justice, we will reject an interpretation that leads to an unreasonable result in favor of another that will lead to a reasonable result." *Rausch v. State Compensation Ins. Fund*, 2002 MT 203, ¶ 29, 311 Mont. 210, ¶ 29, 54 P.3d 25, ¶ 29. *See also*, *Johnson v. Marias River Elec. Co-op., Inc.* (1984), 211 Mont. 518, 524, 687 P.2d 668, 671. Moreover, "[t]his Court must attempt to discern and give effect to the intention of the Legislature, § 1-2-102, MCA; [citation omitted], and construe each statute so as to avoid an absurd result 'and to give effect to the purpose of the statute.'" *State v. Price*, 2002 MT 150, ¶ 26, 310 Mont. 320, ¶ 26, 50 P.3d 530, ¶ 26 (citations omitted). As we noted above, the intention of the act is to provide medical benefits to a worker suffering from a work-related injury or disease. Section 39-71-105, MCA. *See also*, *S.L.H. v. State Compensation Mut. Ins. Fund*, 2000 MT 362, ¶ 33, 303 Mont. 364, ¶ 33, 15 P.3d 948, ¶ 33 (The legislature's objective in enacting these statutes was to compensate workers for valid impairments resulting from injuries suffered on the job.).

¶33    We conclude that the WCC interpreted the word "achieving," as it is used in §§ 39-71-116(25) and 39-71-704(1)(f), MCA (1995), too narrowly. As the WCC fully conceded,

13

interpreting "achievement" of stability to encompass only the first experience of well-being, while ignoring the inevitable relapse that will occur as soon as the medication that made that experience possible is removed, leads to an unreasonable and unjust result. Some medical results once achieved truly constitute an "end," an "attainment," a "completion"--the complete healing of a fracture, or carpal tunnel surgery which resolves a claimant's condition can qualify as such achievements. "Achieving" a level of tolerable pain or a relatively healthy mental attitude in the face of a chronic condition, however, is not such a discrete "end." Rather, it is an ongoing process. Temporary freedom from pain is meaningless if eight hours later intolerable pain and depression have returned. Reaching a level of tolerable physical and mental health after a chronic injury can be "achieved" only when it can be sustained.

¶34 In reaching this conclusion, we are mindful of the Act's references to and definitions of "maintenance care" and "palliative care," as used in § 39-71-704(1)(f), MCA (1995), and as defined in §§ 39-71-116(16) and (20), MCA (1995), respectively. "Maintenance care" is defined as treatment designed to provide "the optimum state of health. . . ." "Palliative care" is defined in terms of treatment designed "to reduce or ease symptoms. . . . " These categories of care come into play only *after* one has "achieved" medical stability as we interpret the phrase here. More to the point, the ability to avoid a relapse through proper primary care is not the Cadillac of treatments--it is not an "optimum" state of affairs, nor is it care which will reduce symptoms below that level already reached with appropriate

14

medication. Thus, we find no tension or irreconcilability between the conclusion we reach here and the Act's reference to "maintenance" or "palliative" care.

¶35 Accordingly, in order to arrive at a reasonable result that will serve the purposes for which the Act was intended, we interpret the phrase "achieving" medical stability and "achieved" medical stability as used in §§ 39-71-116(25) and 39-71-704(1)(f), MCA (1995), respectively, to mean the *sustainment* of medical stability. Given this interpretation, a claimant is entitled to such "primary medical services" as are necessary to permit him or her to *sustain* medical stability.

¶36 The dissent maintains that this Court has exceeded its authority by "inserting" language into the statute and, as a result, has "made new law," and that we have disregarded the "overriding legislative intent" of the 1993 statutory changes creating and defining the categories of "primary" and "secondary" medical services. While we do not dispute that "cost containment" was *a* principle upon which the 1993 bill revising the statutes was based, the legislative history also states as a purpose of the revisions the intention "to provide timely and effective medical services to injured workers." Unfortunately, as noted above, the legislature was silent as to the meaning of "achieving" medical stability as used in the definition of "primary medical services." Not only does the statute fail to provide guidance concerning the very term that is critical to the case before us, but the legislative history offers no help either. Thus we are brought back to *Rausch* and *Price*--when more than one interpretation is possible, in order to promote justice and give effect to the purpose of the

15

statute, we will reject an interpretation that leads to an unreasonable or absurd result in favor of another that leads to a reasonable result.

¶37     Furthermore, while recognizing the business and financial concerns presented to the legislature, we do not find our interpretation of the statute to be in conflict with the legislators' intent.  After all, a stated purpose of the revisions was the provision of  "timely and effective" medical services.  A recurring cycle of temporary provision of medicine for a chronic condition, the withdrawal of the medicine, and its reintroduction as soon as the claimant relapses -- which the dissent recognizes and which, in the case before us, is inevitable  -- hardly qualifies as either "timely" or "effective" medical care.

¶38     Accordingly, we conclude that Hiett is entitled to receive payment for those prescription drugs necessary for her to sustain medical stability.


## CONCLUSION

¶39     For the foregoing reasons, we reverse and remand this matter to the Workers' Compensation Court for entry of judgment consistent with this Opinion.  We affirm, however, the court's conclusion that Hiett is entitled to a penalty with respect to those benefits MSGIA agreed to pay but failed to pay within a reasonable time.


/S/ PATRICIA COTTER


We Concur:

/S/ W. WILLIAM LEAPHART
/S/ JAMES C. NELSON

16

/S/ JIM REGNIER

District Judge Russell C. Fagg dissenting.

¶40    I respectfully dissent. At the outset, I would like to state the majority opinion is well-written and has fairly and thoroughly analyzed the WCC opinion. The majority also makes a good argument this claimant should be entitled to on-going payments for prescription pain and depression medication. However, simply put, the majority's argument should be made to the legislature. As policymaker, the legislature can consider the arguments made and change the law which, as the WCC correctly found, is that Hiett is not entitled to payment for her prescription drugs unless the medications would enable her to return to employment and, once employed, enable her to continue working.

¶41    Today the majority concludes the WCC erred when failing to conclude the word "achieve" means the same thing as "sustain." I disagree. Hiett's reservation of medical benefits can only entitle her to benefits available under Montana statutes. As the majority correctly points out, "primary medical services" are defined as "treatment . . . necessary for achieving medical stability." Section 39-71-116(25), MCA (1995) (emphasis added). On the other hand, "secondary medical services" are defined as "medical services . . . that are considered not medically necessary for medical stability." Section 39-71-116(29)(a), MCA (1995). The WCC concluded, as have other jurisdictions cited in the majority opinion, that medical stability is synonymous with "maximum healing," "maximum medical healing," and MMI. Thus, the WCC correctly determined there was no statutory authority for continuing payment of Hiett's prescriptions beyond MMI, as they were not primary medical services.

¶42    Today's decision changes Montana law and redefines "primary medical service" as treatment necessary for achieving and sustaining medical stability. But it is obvious the

18

1993 legislature intentionally amended the statutes noted above in an attempt to cut costs. By its ruling, the majority has made new law. That is not this Court's job.

¶43    This Court has previously held that legislative intent should be determined from the plain meaning of the language used, if possible, and that a statute should be read and applied as a whole in order to give effect to the statute's purpose and avoid absurd results. *S.L.H. v. State Compensation Mutual Ins. Fund,* 2000 MT 362, ¶ 17, 303 Mont. 364, ¶ 17, 15 P.3d 948, ¶ 17. A plain, commonsense reading of the statutory provisions discussed in the majority opinion yields a necessary conclusion as to a general, overriding legislative intent. The legislature was attempting to reduce costs.[1]

¶44    The "plain meaning" of "achieve" is "to accomplish; carry out successfully." *Shorter Oxford English Dictionary, 5th edition, 2002.* Yet the majority arrives at an expansive interpretation, adding "sustainment," which widens the scope of "primary medical benefits." Adding language to a statute is inappropriate, particularly when doing so increases costs and coverage the legislature specifically intended to curtail.

---

[1]This point is beyond debate. Indeed, even counsel for both Petitioner and Amicus, in oral arguments and/or via brief, have acknowledged the legislature's obvious cost-cutting motives. Amicus refers to the legislature's motive for these statutes as being, "simply to save costs." Brief of Amicus Curiae, dated April 18, 2002, p.19. Petitioner notes the very distinction between primary and secondary medical services is the product of a 1993 Amendment aimed at cutting costs, and documents the legislature's steady march away from the WCA's originally stated purpose in an effort to save money. "It is well known that beginning in 1987 and continuing to the present, the Montana Legislature has tinkered with worker's compensation in response to a proposed business crisis in the state." Brief of Appellant, dated March 12, 2002, p.21.

¶45 The majority reasons that denying Petitioner her pain and depression medication would yield an "absurd" result. While I do not fault the majority for its strong distaste for the statutory scheme as written, I cannot conclude that it constitutes an absurdity which would permit us to change the written law.

¶46 As § 39-71-116(25), MCA (1995), is written, an injured worker will only receive primary medical benefits up to the point they reach their maximum state of healing–or "medical stability." Thus, we come to unpleasant situations such as the one before us. Eula Mae Hiett reached medical stability. As her pain and depression medication at that point no longer fit under either the definition of primary or secondary medical services, she was no longer entitled to her medication. But if and when she relapsed to a sub-maximum medical improvement level, those drugs would become "primary medical services," and would again be covered.

¶47 Many descriptions for such an approach come to mind. Many might agree the majority is not far off when it calls such an approach "unreasonable and unjust." But that is not a reason for a court to rewrite a law. A six-year-old child could be diagnosed with leukemia tomorrow, and if no law would require anyone to pay a cent for his care, most would think it unreasonable and unjust. However, that would not be cause for us to write law requiring coverage. The same principle applies here. When it comes right down to it, the basis for the majority's holding is their sympathy for the Petitioner. I would leave redefining or changing the law to the Montana legislature, who hears sympathetic pleas daily during their legislative sessions, and can properly weigh those sympathies and write law accordingly.

20

¶48    In summary, I would affirm the WCC.  In a 17½ page, single-spaced opinion, it painstakingly analyzed Montana law and correctly concluded there was no statutory authority for continuing Hiett's prescriptions.  Hiett should only receive those benefits Montana law allows, and it is not for this Court to expand those benefits or Montana law.

/S/ RUSSELL C. FAGG

Honorable Russell C. Fagg, District
Judge, sitting in place of former Justice
Terry N. Trieweiler

Justice Jim Rice joins in the foregoing dissent of District Judge Fagg.

/S/ JIM RICE

Chief Justice Karla M. Gray joins in the foregoing dissent of District Judge Fagg.

/S/ KARLA M. GRAY