

DA 08-0313

IN THE SUPREME COURT OF THE STATE OF MONTANA

2009 MT 162

LARRY QUICK,

       Petitioner, Appellant and Cross-Appellee,

  v.

MONTANA STATE FUND,

       Respondent, Appellee and Cross-Appellant.

APPEAL FROM:    Workers' Compensation Court, State of Montana
                   Honorable James Jeremiah Shea, Presiding Judge

COUNSEL OF RECORD:

       For Appellant:

            J. David Slovak and Keith Marr, Lewis, Slovak & Kovacich, Great Falls, Montana

       For Appellee:

            Greg E. Overturf and Thomas E. Martello, Montana State Fund, Helena, Montana

                      Submitted on Briefs:  April 15, 2009

                                Decided:  May 13, 2009

Filed:

_____
                         Clerk

Justice Brian Morris delivered the Opinion of the Court.

¶1 Larry Quick (Quick) appeals that portion of the Workers' Compensation Court's (WCC) judgment that denied him retroactive domiciliary care benefits before February 1, 2007. Montana State Fund (State Fund) cross-appeals that portion of the WCC's judgment that granted Quick a 20% penalty to reflect the difference between the rate for domiciliary care that the State Fund had paid Quick beginning on February 1, 2007, and the rate that the WCC deemed appropriate. We affirm.

¶2 We review the following issues on appeal:

¶3 *Did the WCC correctly determine that Quick was not entitled to retroactive domiciliary care benefits before February 1, 2007?*

¶4 *Did the WCC correctly find State Fund liable for a 20% penalty on the difference between the domiciliary care rate paid by State Fund and the rate that the WCC deemed appropriate?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶5 Quick suffered a brain injury on June 15, 1984, in a work-related motor vehicle accident. Quick was 35 years old. State Fund accepted liability for Quick's worker's compensation claim and paid certain compensation and medical benefits. Quick continued to work for several months after the accident, but his injuries eventually forced him to quit. Quick unsuccessfully attempted to return to work on several occasions.

¶6 Numerous medical and psychological providers treated Quick over the years, including medical doctors, psychiatrists, dentists, and chiropractors. Quick initially saw Lee

2

Hudson, D.C., on June 25, 1984. Quick complained of dizziness, pain, headaches, soreness, and stiffness. Dr. Hudson diagnosed Quick with acute cervical, thoracic, and lumbar strain. Richard A. Nelson, M.D., treated Quick in 1985. A CT scan showed a minimal bulge on Quick's spine. Dr. Nelson diagnosed Quick with cervical subluxation and sprain syndrome and recommended physical therapy, use of a whirlpool, and pain medication.

¶7 Brian V. Earle, M.D., wrote a letter to Quick's counsel on May 5, 1987. Dr. Earle expressed concern that Quick presented a suicide risk due to a major depressive illness that required treatment. Dr. Earle predicted that Quick would be disabled completely for a period of at least three years, at which time "recovery remains a good possibility."

¶8 William S. Shaw, M.D., headed a panel that evaluated Quick in December of 1987. The panel concluded that Quick's neck, head, and shoulder pain were myofascial in nature and that Quick's "overriding problem at this point appears to be significant depression." The panel rendered a 5% impairment rating and determined that Quick was at maximum medical improvement except for his depression. The panel noted organic brain syndrome as a possible source of Quick's ongoing problems and recommended neuropsychologic testing.

¶9 Dr. Robert B. LeLieuvre, Ph.D., performed a neuropsychological evaluation of Quick on June 6, 1988. Dr. LeLieuvre stated that Quick showed signs of mild decreased neuropsychological functioning. Dr. LeLieuvre believed that the "mild signs may well be consistent with a past, mild closed head injury of the type he might have sustained in an auto accident."

¶10     Quick attended an eight-week pain clinic at the UCLA Pain Management Center in February of 1989. The Center diagnosed Quick with headaches of musculoskeletal origin, head and neck myofascial pain, severe depression, and multiple perpetuation factors. Quick learned various pacing techniques and stretching exercises. Quick's wife, Dolly, attended the program part-time and learned pain management techniques that she used to assist Quick with his pain.

¶11     Luis A. Cueva, D.D.S., sent a letter to Quick's counsel on November 9, 1989, that outlined his recommendations following Quick's stay at the pain clinic. Dr. Cueva recommended long term follow-up at the pain center approximately every six months, a home exercise program, psychotherapy sessions to manage Quick's chronic depression, the use of a whirlpool bath, the use of an orthotic splint at night, and the use of a chair with lumbar support. Dr. Cueva noted that Quick had improved during treatment and had performed daily work routines without an increase in pain. Dr. Cueva stated that Quick had progressed to the light-medium physical demand work level. Dr. Cueva concluded that he did not find any permanent disability associated with Quick's head and neck symptoms, although he felt that Quick's chronic headaches and neck soreness could cause impairment that would decrease his employment ability.

¶12     Dr. Earle sent a letter in August of 1989 to Michelle A. Rowe, a rehabilitation counselor working with Quick. Dr. Earle opined that Quick was suited to the position of drafter, coordinating with builders, architects, planners, and building inspectors, as long as Quick could take pain medication and stretch regularly throughout the workday. Quick

underwent cognitive testing performed by Edward E. Shubat, Ph.D., on April 9, 1990. Quick's verbal and performance IQ fell within the average range. Dr. Shubat recommended that Quick obtain treatment for his head injury outside of Montana due to his extremely complex case. Quick attended a rehabilitation program in Lakewood, Colorado, in November and December of 1990. Janet Van Dyke performed a vocational evaluation in June of 1990 and concluded that supported employment represented the most feasible option for Quick.

¶13 Quick unsuccessfully attempted to return to regular employment. State Fund conceded in 1991 that Quick was permanently and totally disabled. Quick settled the indemnity portion of his claim in 1991 with the assistance of counsel. Quick did not settle on medical benefits.

¶14 Despite his disability, Quick worked as an assistant coach for several high school and college basketball teams throughout the 1990s. Quick also worked to remodel a home that the Quicks had purchased in Havre, Montana, in 1991. Quick managed to go hunting several times. Quick drove by himself from Tucson, Arizona, to Circle, Montana, in 2000 to start a part-time basketball coaching job. Dr. Nelson H. de Jesús, Ph.D., a psychologist specializing in pain management, noted that Quick's coaching went well and that the school asked Quick to return as a coach.

¶15 Quick moved to Tucson, Arizona, in 1996 and established medical care. Quick moved back to Havre in 2001, but continued to treat with Tucson doctors. State Fund paid

5

for both Quick's and Dolly's travel to Arizona. State Fund also compensated Dolly $29 per hour for the time that she spent caring for Quick while traveling.

¶16 Dolly estimated that she cared for Quick for between 12 and 24 hours a day from the date of his accident in 1984. Dolly worked as an apartment manager for approximately two years beginning in 1985. The position allowed her to assist Quick with daily living as she could work out of their apartment. Dolly worked at Havre Optometric from 1987 to 1991 and eventually worked up to a full-time position. Dolly entered nursing school in 1991 and received a bachelors degree in nursing in 1995. Dolly worked at a variety of part-time and full-time nursing positions from 1995 through November of 2005. Dolly did not work between August of 2000 and August of 2001. Dolly testified that she cared for Quick 24 hours per day during this time period.

¶17 Dolly testified that Quick's injury has been extremely difficult for the Quick family. She recounted the emotional and financial stresses that the family had endured as a result of Quick's accident. Dolly testified that she constantly assisted Quick with pain management. Dolly's training as a Registered Nurse (RN) enabled her to provide better care than she could provide without the training.

¶18 Quick filed a Petition for Trial on December 26, 2006, to obtain domiciliary care benefits. State Fund initially denied liability for the domiciliary care. State Fund accepted liability for 24-hour domiciliary care, however, after it received a letter dated February 1, 2007, from Dr. de Jesús. Dr. de Jesús reported that Quick required full-time domiciliary

6

care. State Fund began to pay Quick domiciliary care benefits at the rate of $7.50 per hour retroactive to February 1, 2007.

¶19 The WCC conducted a trial from March 30, 2007, to April 5, 2007. The WCC rejected Quick's claim that he was entitled to retroactive domiciliary care benefits before February 1, 2007. The WCC ordered State Fund to pay Quick's domiciliary care benefits at the rate of $20 per hour commencing on February 1, 2007. The WCC further imposed on State Fund a 20% penalty on the difference between the $7.50 per hour paid by State Fund and the $20 per hour rate that the WCC deemed appropriate. Quick appeals the WCC's denial of retroactive domiciliary care benefits. State Fund cross-appeals the 20% penalty.

## STANDARD OF REVIEW

¶20 We review de novo the WCC's conclusions of law to determine whether they are correct. *Harrison v. Liberty Northwest Ins. Corp.*, 2008 MT 102, ¶ 11, 342 Mont. 326, 181 P.3d 590. Our review of the WCC's findings of fact is limited in scope and highly deferential. We simply review whether substantial credible evidence supports the WCC's factual findings. *Harrison*, ¶ 11. Substantial credible evidence is that which a reasonable mind could accept as adequate to support a conclusion. We will consider the evidence to be substantial even if other evidence contradicts it, even if it is somewhat less than a preponderance, and even if it is inherently weak. *Harrison*, ¶ 11. The evidence must be more than a mere "scintilla" of evidence, however, and it must rise above the level of "trifling or frivolous." *Harrison*, ¶ 11.

7

¶21 We do not resolve conflicts in the evidence, and we do not consider whether evidence supports findings that are different from those made by the WCC. We confine our review to the determination of whether substantial credible evidence supports the findings actually made by the WCC. *Harrison*, ¶ 11. We defer to the WCC's findings concerning the credibility and weight of witnesses who testify in person at trial. The WCC resolves any inconsistencies in a witness's testimony. *Harrison*, ¶ 12. We conduct de novo review of deposition testimony that a party presents at trial, but we ultimately are restricted to determining whether substantial credible evidence supports the WCC's findings. *Harrison*, ¶ 13.

## DISCUSSION

¶22 *Did the WCC correctly determine that Quick was not entitled to retroactive domiciliary care benefits before February 1, 2007?*

¶23 Quick argues that the severity of his injuries put State Fund on constructive notice of his need for domiciliary care and thereby entitles him to domiciliary benefits retroactive from the date of his injury on June 15, 1984. The WCC correctly applied the 1983 version of the Montana Workers' Compensation Act (Act) that was in effect at the time of Quick's 1984 work-related accident. *See Buckman v. Montana Deaconess Hosp.*, 224 Mont. 318, 321, 730 P.2d 380, 382 (1986). The WCC also correctly stated that Quick bears the burden of proving by a preponderance of the evidence that he is entitled to the retroactive domiciliary benefits. *See Dumont v. Wickens Bros. Constr. Co.*, 183 Mont. 190, 201, 598 P.2d 1099, 1106 (1979).

8

¶24　The Act did not expressly provide for domiciliary care benefits at the time of Quick's injury in 1984. We determined in *Carlson v. Cain*, 216 Mont. 129, 139-41, 700 P.2d 607, 614-15 (1985), that insurers are responsible for domiciliary care benefits under § 39-71-704, MCA (1983), if the claimant meets certain criteria. The pertinent issue for our analysis is whether "[t]he employer knows of the employee's need for medical services at home resulting from the industrial injury." *Carlson*, 216 Mont. at 140, 700 P.2d at 614. Quick argues that the medical records establish that State Fund had at least constructive notice of Quick's need for domiciliary care since the date of the accident. Quick contends that State Fund cannot distinguish his case from *Larson v. Squire Shops, Inc.*, 228 Mont. 377, 742 P.2d 1003 (1987).

¶25　Larson suffered a traumatic head injury in an automobile accident in February of 1983. Larson's accident caused permanent brain injury and left him permanently disabled. *Larson*, 228 Mont. at 378, 742 P.2d at 1004. Larson did not return to work. Larson's wife became his primary caretaker upon his release from the hospital on March 3, 1983. *Larson*, 228 Mont. at 379, 742 P.2d at 1004. The WCC determined on November 4, 1985, that the insurer was liable for domiciliary care from the date of Larson's release from the hospital. *Larson*, 228 Mont. at 379, 742 P.2d at 1004. Upon rehearing, the WCC revised its judgment and held that the insurer should not be liable for domiciliary care before August 22, 1985, as Larson had not raised the issue of domiciliary care until that date. *Larson*, 228 Mont. at 379, 742 P.2d at 1005.

9

¶26 This Court reversed the WCC's ruling and held that the insurer should compensate Larson's wife for domiciliary care from the date of his release from the hospital. *Larson*, 228 Mont. at 385, 742 P.2d at 1008. The Court determined that State Fund had constructive notice of Larson's need for domiciliary care. The Court emphasized the "unquestioned severity of the injury, the degree of medical attention [Larson] required while in the hospital and the permanence of the resulting disabilities." *Larson*, 228 Mont. at 385, 742 P.2d at 1008. The Court stated that "need for domiciliary care must be supported by medical evidence, and we find it is." *Larson*, 228 Mont. at 385, 742 P.2d at 1008.

¶27 In *Hilbig v. Central Glass Co.*, 238 Mont. 375, 382, 777 P.2d 1296, 1300 (1989), this Court affirmed the WCC's conclusion that Hilbig was not entitled to retroactive domiciliary care benefits. Hilbig suffered a severe head injury in a fall from a scaffold that left him permanently totally disabled. *Hilbig*, 238 Mont. at 376, 777 P.2d at 1297. Hilbig claimed that his employer had constructive knowledge of his need for home health care from the day that the hospital released him on December 6, 1983. Hilbig pointed to medical records that demonstrated the severity of his head injury and his memory loss, headaches, depression, and anxiety. *Hilbig*, 238 Mont. at 381-82, 777 P.2d at 1300.

¶28 The WCC granted Hilbig domiciliary care beginning on the date that the employer first had knowledge of the need or demand for domiciliary care. *Hilbig*, 238 Mont. at 380, 777 P.2d at 1299. The WCC found that Hilbig first requested domiciliary care on December 18, 1986, at a pretrial conference. The WCC also found that the medical reports before that date had not recommended home health care. *Hilbig*, 238 Mont. at 381, 777 P.2d at 1300.

10

The Court emphasized that "the employer's knowledge of the employee's need for medical services is one factor which must be met when considering eligibility for domiciliary care." *Hilbig*, 238 Mont. at 381, 777 P.2d at 1300 (citing *Larson*, 228 Mont. at 385, 742 P.2d at 1008). The Court declined to disturb the WCC's conclusion as substantial evidence in the record supported its findings. *Hilbig*, 238 Mont. at 382, 777 P.2d at 1300.

¶29 The WCC entered detailed findings of fact regarding Quick's medical condition from the date of the injury through 2007. The WCC extensively described Quick's medical and vocational history based on medical records and trial testimony. The WCC also entered findings of fact derived from the testimony of Dolly Quick and the two State Fund claims specialists who had handled Quick's case. The claims adjusters testified regarding their claims files and their interactions with Quick's medical providers. The WCC further entered detailed findings of fact derived from the testimony of a number of medical professionals who had treated Quick.

¶30 The WCC concluded that the severity of Quick's condition from the time of his injury, unlike the situation in *Larson*, "was not so readily apparent as to put [State Fund] on notice of [Quick's] need for domiciliary care." The WCC noted Quick's return to work for a period of time after the accident. The WCC emphasized medical records that indicated that Quick had shown signs of improvement or potential recovery, expert opinions that stated that Quick was suitable for certain types of employment, and test results that indicated that Quick possessed an average IQ. The WCC also pointed to Quick's part-time and volunteer work efforts and his ability to drive himself both locally and on long-distance trips. The WCC

11

also noted Dolly's work outside the home on an intermittent basis through 2005. The WCC emphasized that the first medical opinion establishing Quick's need for domiciliary care was Dr. de Jesús's letter of February 1, 2007.

¶31 The WCC acknowledged that Dolly had provided care to Quick for extended periods since his accident. The WCC determined, however, that "the events set forth above are not necessarily indicative of the need for domiciliary care." The WCC also highlighted an assertion by Quick's counsel in a September 2, 2005, letter to State Fund that Quick "has never made a claim for domiciliary care." The WCC concluded that it was "hard-pressed to find that [State Fund] should have been on notice that [Quick] was in need of domiciliary care since the time of his 1984 injury when his own attorney was contending in 2005 that he had never made such a claim."

¶32 The WCC's factual findings constitute more than a mere "scintilla" of evidence, and rise far above the level of "trifling or frivolous," notwithstanding Quick's claim that selected portions of the twenty-three year record contradict the court's findings. *Harrison*, ¶ 11. As we stated in *Harrison*, "we do not resolve conflicts in the evidence, and we do not consider whether evidence supports findings that are different from those made by the WCC; rather, we confine our review to determining whether substantial credible evidence supports the findings actually made by the WCC." *Harrison*, ¶ 11.

¶33 Our review of the record convinces us that substantial credible evidence supports the WCC's factual findings. *Harrison*, ¶ 11; *Hilbig* 238 Mont. at 382, 777 P.2d at 1300. We decline to disturb the WCC's conclusions based on those findings. *Harrison*, ¶¶ 13, 22. The

12

WCC correctly determined that State Fund had not received constructive notice before February 1, 2007, and that Quick was not entitled to receive retroactive domiciliary benefits before that date.

¶34 *Did the WCC correctly find State Fund liable for a 20% penalty on the difference between the domiciliary care rate paid by State Fund and the rate that the WCC deemed appropriate?*

¶35 The WCC may increase the full amount of a claimant's compensation benefits by 20% when the insurer unreasonably delays or refuses to make payments. Section 39-71-2907, MCA. "The question of unreasonable delay or refusal shall be determined by the workers' compensation judge." Section 39-71-2907(2), MCA.

¶36 State Fund offered Quick $7.50 per hour for 24-hour domiciliary care on the eve of the trial. The WCC considered testimony from multiple doctors that Quick required the level of care that only an RN could provide. Kertrina Miller, RN, and Lora K. White, RN, testified as to the pay rates of RNs, both in Montana and in Tucson, Arizona. They determined that home health nurses' salaries ranged from $25 to $65 per hour. The WCC further noted the $29 per hour that State Fund had paid Dolly for her travel time with Quick in 2005 and 2006. The WCC lowered the hourly rate that it awarded Quick to $20 per hour based on the reality that Dolly had a greater level of discretion and freedom than did a privately retained nurse.

¶37 State Fund does not appeal the WCC's determination that Quick was entitled to 24-hour domiciliary care at the rate of $20 per hour. State Fund instead argues that it acted

13

reasonably in questioning the monetary value of the services provided by Dolly and that the 20% penalty therefore was unjustified. State Fund relies on *Simms v. Montana State Fund*, 2004 MTWCC 27, 2004 WL 525200 (Mont. Work. Comp. Ct. 2004) (*Simms – Work. Comp. Ct.*) *aff'd*, *Simms v. State Compensation Ins. Fund*, 2005 MT 175, 327 Mont. 511, 116 P.3d 773 (*Simms*). In *Simms – Work. Comp. Ct.*, ¶ 53, the WCC denied Simms's request for a handicapped accessible van. *Simms*, ¶ 10. The WCC determined that the van was not a reasonable medical expense or a medical necessity as Simms had other reasonable means of transportation. *Simms – Work. Comp. Ct.*, ¶¶ 45-46; *Simms*, ¶ 22. The WCC concluded that "nothing in the statutes . . . requires a Rolls Royce where the Chevy would be adequate." *Simms – Work. Comp. Ct.*, ¶ 45. The WCC denied Simms's request based on its determination that the van was not a medical necessity. State Fund does not dispute the medical necessity of Quick's 24-hour domiciliary care. *Simms* fails to support State Fund's argument.

¶38    State Fund also suggests that the WCC's penalty was improper because the total amount that Quick will receive each year "equals far more than that of the average working Montanan." State Fund did not appeal the WCC's determination that $20 per hour represented the appropriate rate for Quick's domiciliary care. This concession undermines State Fund's argument that the wage of the average working Montanan should play a role in determining the appropriate rate for domiciliary care benefits.

¶39    The WCC properly confined its analysis to whether the State Fund's $7.50 per hour rate reasonably approximated the value of the nursing services that Quick requires. The

14

WCC noted that in 1987 and 1989, this Court upheld the WCC's awards of $7.00 per hour and $7.50 per hour to claimants' spouses for 24-hour domiciliary care. *See Larson*, 228 Mont. at 384-85, 742 P.2d at 1008; *Hilbig*, 238 Mont. at 382, 777 P.2d at 1300. The WCC stated that "[i]f I were to consider nothing other than the unquestionable increase in medical care costs since the late 1980s, [State Fund's] rate of $7.50/hr. . . . would be unreasonable." The WCC emphasized that the claimants' spouses in *Larson* and *Carlson* were not RNs, and pointed to medical records and testimony from medical professionals that indicated that Quick required RN-level nursing care. Substantial credible evidence supports the WCC's determination that State Fund's offer was unreasonable. *Harrison*, ¶ 11; *Hilbig* 238 Mont. at 382, 777 P.2d at 1300. The WCC correctly awarded Quick a 20% penalty.

¶40    Affirmed.

/S/ BRIAN MORRIS

We Concur:

/S/ MIKE McGRATH
/S/ JAMES C. NELSON
/S/ JOHN WARNER
/S/ JIM RICE

Justice James C. Nelson concurs.

¶41    I concur in the Court's Opinion. However, had I been the trial judge I would have awarded Quick domiciliary care benefits before February 1, 2007. I join the Court's Opinion only because I was not the trial judge, and because, as an appellate judge, I am constrained to

15

affirm the trial court's decision by the standards of review set forth in ¶¶ 21 and 32 of the Court's Opinion. It strikes me as being anomalous, nonetheless, that on the one hand we are affirming the trial court's decision against Quick, but on the other we are affirming the trial court's award of a 20% penalty against State Fund for its unreasonable conduct.

¶42     I concur.


/S/ JAMES C. NELSON