

DA 11-0492

IN THE SUPREME COURT OF THE STATE OF MONTANA

2012 MT 67

MONTANA STATE FUND,

　　　　　Respondent and Appellant,

　　v.

CLARENCE GRANDE,

　　　　　Petitioner and Appellee.

APPEAL FROM:　　Montana Workers' Compensation Court, WCC No. 2010-2474
　　　　　　　　　　Honorable James Jeremiah Shea, Presiding Judge

COUNSEL OF RECORD:

　　　　　For Appellant:

　　　　　　　　Kevin Braun, Special Assistant Attorney General, Montana State Fund,
　　　　　　　　Helena, Montana

　　　　　For Appellee:

　　　　　　　　Laurie Wallace, Bothe & Lauridsen, P.C., Columbia Falls, Montana

　　　　　　　　　　　　　　　　Submitted on Briefs:　February 8, 2012

　　　　　　　　　　　　　　　　　　　　　Decided:　March 20, 2012

Filed:

　　　　　　　_____
　　　　　　　　　　　　　　　　Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1    The Montana State Fund (MSF) appeals a decision of the Workers' Compensation Court (WCC) concluding that Clarence Grande's job duties as a truck driver for City Service Valcon (Valcon) are the major contributing cause of his arthritic condition, thus he is suffering from an occupational disease. We affirm.

¶2    MSF raises the following three issues on appeal:

¶3    1.    Whether the WCC erred in concluding that Grande is suffering from a compensable occupational disease arising out of and in the course and scope of his employment.

¶4    2.    Whether the WCC erred in ordering payment of temporary total disability benefits and medical benefits.

¶5    3.    Whether the WCC erred in ordering payment of costs.

¶6    MSF's entire argument on Issues 2 and 3 consists of one sentence in the conclusion section of its initial brief wherein MSF states: "Upon reversal of the threshold issue regarding the compensability of the claim, the award of benefits and costs should likewise be reversed disposing of the two remaining issues on appeal." Since we are affirming on the threshold issue, we do not address MSF's second and third issues.

**Factual and Procedural Background**

¶7    Grande has been a truck driver his entire life. Prior to his employment with Valcon, he was self-employed as an over-the-road truck driver. He also drove a dump truck for one season.

2

¶8 Grande began working for Valcon in October 2005, as a long-haul propane truck driver. He worked up to 15 hours per day, 60 hours per week driving throughout the northwest and into Canada obtaining and delivering propane in a truck that consisted of a tanker and a pup (a second tanker hooked behind the first). Grande's job required that he hook up several large hoses to the tanker and the pup as well as the propane storage tanks. Some of the hoses were four inches in diameter with a heavy brass end. Grande had to unscrew the caps covering the valves of the truck, the pup and the storage tanks before connecting the hoses. Grande testified that there were as many as 12 valves that needed to be opened and closed during the loading and unloading processes.

¶9 In addition, Grande was constantly shifting amongst the 18 gears on his truck. And, during the winter, Grande would have to chain up his truck as often as three times a week depending on the weather. A set of triple chains, which went on both sides of the truck, weighed 75 pounds. Grande also had to install sets of single chains on the back of the truck and on the pup.

¶10 Janet Schroeder of Vocational Management Services, Inc., described Grande's job duties as follows:

> Operates tractor/trailer to transport propane over the road in western Montana, Idaho, and eastern Washington: Performs pre-trip inspection. Drives tractor/trailer to pick up propane in Canada and delivers to customers. Drives truck into position to load at filling rack. Opens valves or starts pumps to fill tank. Reads gauges or meters and records quantity loaded. Drives truck and delivers propane to customer's businesses. Pulls hose from a storage tube along side of tank. Pulls hose from a storage tube on side of truck. Opens valves to drain tank. Records amount delivered. Returns hose to hose tubes. Maay [sic] have to chain up during adverse weather conditions. Maintains driver's log according to DOT regulations. . . . Employee reaches wai[s]t to chest height on a continual

3

basis to steer vehicle; use of clutch and break [sic] as well as accelerator is used continuously. Employee must use right arm to shift truck. . . . Employee uses grip/grasp to steer and shift truck, pull self into/out of truck, and to pull hose, etc.

¶11 Dr. John Schumpert, who specializes in occupational and environmental medicine, conducted an independent medical examination of Grande for a prior back injury on January 9, 2007. Dr. Schumpert later noted that at the time of that evaluation, Grande did not exhibit symptoms of arthritis.

¶12 Grande was referred to Dr. Bernadette Van Belois in August 2007, for suspicion of arthritis in his hands. Dr. Van Belois is board certified in both rheumatology and internal medicine. She diagnosed Grande as having osteoarthritis with the possibility of an additional diagnosis of inflammatory arthritis, possibly rheumatoid arthritis. Dr. Van Belois noted that there is a genetic predisposition for a person to develop osteoarthritis and rheumatoid arthritis. Grande has a family history of arthritis with his parents, grandparents, a brother and a cousin all suffering from various forms of the disease.

¶13 Grande had a number of follow-up visits with Dr. Van Belois between January 2008 and July 2009. Dr. Van Belois changed Grande's medications several times, but without any significant improvement in his condition. On July 16, 2009, Grande called Dr. Van Belois' office complaining of pain and swelling in his hands to such a degree that it made it difficult for him to work. After a visit on July 27, 2009, Dr. Van Belois noted in Grande's medical chart that Grande was unable to continue working as a truck

4

driver because of the significant swelling and pain in his right hand in particular "that would make any occupation, including a sedentary one, difficult for him."

¶14 In a letter dated August 3, 2009, "To Whom it May Concern," Dr. Van Belois stated that Grande's arthritis, which caused significant pain and swelling in his right hand in particular, "impaired his ability to safely drive a truck." Dr. Van Belois also noted in the letter that the pain medication Grande was taking may make him drowsy and impair his senses, thus she had advised him to stop working.

¶15 Grande resigned from his employment with Valcon effective August 7, 2009. He had worked for Valcon for almost four years. In addition to Dr. Van Belois' recommendation that he stop working, Grande was unable to pass the physical examination necessary to renew his commercial drivers license (CDL). Grande later testified that if it wasn't for his arthritic condition, he would still be driving truck. Grande filed a claim for compensation with MSF on August 13, 2009. He alleged in his claim that he suffered from an occupational disease in the form of rheumatoid arthritis and osteoarthritis as a result of his employment with Valcon.

¶16 In response to questions from Grande's counsel, Dr. Van Belois wrote a letter dated August 26, 2009, wherein she opined that Grande's job duties, which involved repetitive use of his hands with repetitive firm gripping, had aggravated his arthritis to such an extent that he was unable to continue working. She pointed out that Grande's job aggravated his arthritis rather than causing it. Dr. Van Belois stated that, in her medical opinion, Grande's arthritis is an occupational disease.

¶17 Dr. Schumpert reviewed Grande's medical records at the request of MSF. In a report dated February 18, 2010, Dr. Schumpert stated that he believed that Grande could continue to work as a truck driver. He also stated that he did not feel that Grande was suffering from an occupational disease or that Grande's employment was the major contributing cause of his condition. Instead, Dr. Schumpert stated that in his opinion, Grande is suffering from rheumatoid arthritis, an autoimmune disorder that is unrelated to his employment as a truck driver. Dr. Schumpert also opined that Grande's osteoarthritis is not caused by truck driving and that his work did not aggravate his underlying arthritic condition.

¶18 MSF denied liability for Grande's occupational disease claim on March 5, 2010. Thereafter, Grande filed a Petition for Hearing with the WCC. After various filings by both parties, the WCC entered its Findings of Fact, Conclusions of Law and Judgment on June 17, 2011, in which it concluded that Grande's job duties were the major contributing cause of his arthritis, therefore he is suffering from a compensable occupational disease. Grande filed a motion to amend the WCC's decision, but that motion was denied on July 22, 2011. The WCC subsequently granted MSF's motion for a stay while MSF appealed the WCC's Findings of Fact, Conclusions of Law and Judgment.

**Standard of Review**

¶19 We review findings of fact made by the WCC to determine whether those findings are supported by substantial, credible evidence, and we review conclusions of law made by the WCC to determine if those conclusions are correct. *Wright v. Ace American Ins. Co.*, 2011 MT 43, ¶ 13, 359 Mont. 332, 249 P.3d 485 (citing *Hiett v. Missoula County*

6

*Pub. Schs.*, 2003 MT 213, ¶ 15, 317 Mont. 95, 75 P.3d 341). In reviewing the WCC's factual findings, we will not resolve conflicts in the evidence or consider whether the evidence supports findings that are different from those made by the WCC. Instead, we will confine our review to determining whether substantial credible evidence supports the findings made by the WCC. *Wright*, ¶ 14 (citing *Quick v. Mont. State Fund*, 2009 MT 162, ¶ 32, 350 Mont. 455, 208 P.3d 415). In addition, we will defer to the WCC's findings concerning credibility and the weight to be accorded to the testimony of witnesses who testify in person at trial. But, because we are in as good a position as the WCC to assess deposition testimony presented at trial, we will review such deposition testimony de novo. *Wright*, ¶ 14 (citing *Harrison v. Liberty Northwest Ins. Corp.*, 2008 MT 102, ¶¶ 12-13, 342 Mont. 326, 181 P.3d 590). Nevertheless, "even where we conduct de novo review of deposition testimony, we are ultimately restricted to determining whether substantial credible evidence supports the WCC's findings." *Wright*, ¶ 14 (citing *Harrison*, ¶ 13).

**Discussion**

¶20 *Whether the WCC erred in concluding that Grande is suffering from a compensable occupational disease arising out of and in the course and scope of his employment.*

¶21 MSF argues that following the changes to the occupational disease statutes in 2005, a claimant's employment must be the major contributing cause of the claimant's condition in order to have a compensable occupational disease. In addition, according to MSF, a work-related aggravation of a personal health condition, such as Grande's arthritis, is not compensable unless the aggravation is due to a compensable injury or

occupational disease. MSF maintains that Grande's employment was not the major contributing cause of his arthritic condition, and that the aggravation of his condition was not due to a compensable injury or occupational disease, hence the WCC erred when it concluded that Grande suffers from an occupational disease.

¶22 Grande contends on the other hand that where it is established that the harm complained of is evidenced by objective medical findings and the job duties were the leading cause contributing to that harm, an occupational disease is proven regardless of whether the harm is a new condition, or an aggravation of a pre-existing condition. Thus, Grande argues that the decision of the WCC should be affirmed.

¶23 We have repeatedly stated that the law in effect on an employee's last day of work governs the resolution of an occupational disease claim. *Hardgrove v. Transportation Ins. Co.*, 2004 MT 340, ¶ 2, 324 Mont 238, 103 P.3d 999 (citing *Grenz v. Fire & Cas.*, 278 Mont. 268, 271, 924 P.2d 264, 266 (1996)). Because Grande's last day of work was August 7, 2009, the 2009 version of the Workers Compensation Act (WCA) applies in this case.

¶24 In 2005, the Montana Legislature repealed the Occupational Disease Act (ODA) (Title 39, chapter 72, MCA), and amended numerous sections of the WCA to incorporate the necessary provisions to continue coverage for occupational diseases. 2005 Mont. Laws 1404-33. The 2009 version of the WCA is substantially similar to the WCA as amended in 2005.

¶25 Section 39-71-116(20), MCA (2009), defines an occupational disease as:

(a) . . . harm, damage, or death arising out of or contracted in the course and scope of employment caused by events occurring on more than a single day or work shift.

(b) The term does not include a physical or mental condition arising from emotional or mental stress or from a nonphysical stimulus or activity.

In addition, § 39-71-407(8), MCA (2009), provides that every employer is liable for the payment of compensation for an occupational disease that "arises out of or is contracted in the course and scope of employment." Section 39-71-407, MCA (2009), further provides:

(9) Occupational diseases are considered to arise out of employment or be contracted in the course and scope of employment if:

(a) the occupational disease is established by objective medical findings; and

(b) the events occurring on more than a single day or work shift are the major contributing cause of the occupational disease in relation to other factors contributing to the occupational disease.

.  .  .

(13) As used in this section, "major contributing cause" means a cause that is the leading cause contributing to the result when compared to all other contributing causes.

¶26 MSF contends in the case *sub judice* that the WCC impermissibly reverted to the pre-2005 standard for determining compensability of an occupational disease claim. That standard was set forth in *Polk v. Planet Ins. Co.*, 287 Mont. 79, 951 P.2d 1015 (1997).

¶27 Polk worked in a factory owned by Koch Agriculture, Inc. (Koch) from 1985 to 1993. Koch processed seeds from various types of grain into oil and meal generally sold for cattle feed. Polk performed physical labor at the factory which included carrying and stacking sacks of meal, cleaning the machinery, and scraping moldy grain from the inside of the elevator and machine pits. Although Polk's job subjected him to dust and airborne

9

mold, Koch did not provide him with a dust mask until sometime in 1992. *Polk*, 287 Mont. at 81, 951 P.2d at 1016.

¶28 In April 1991, Polk began experiencing health problems. He tired easily, he had trouble breathing, and he lost nearly 40 pounds. Polk had been a heavy smoker for 30 years. He attempted to quit smoking in December 1993, but he was not entirely successful as he continued to smoke occasionally. By November or December 1993, Polk's doctor advised him to leave his job. *Polk*, 287 Mont. at 81, 951 P.2d at 1016.

¶29 Polk filed a claim for occupational disease benefits in January 1994. Polk was examined by several doctors, some of whom concluded that he suffered from an occupational disease and others who concluded that he did not. After a hearing, the hearings examiner with the Montana Department of Labor and Industry determined that Polk was not suffering from an occupational disease. Polk appealed to the WCC in March 1996. The WCC determined that the hearings examiner's findings were not clearly erroneous and were supported by substantial evidence. *Polk*, 287 Mont. at 81-83, 951 P.2d at 1016-17.

¶30 The statute at the time *Polk* was decided provided that a worker may receive compensation "[i]f an occupational disease is aggravated by any other disease or infirmity not itself compensable or if disability or death from any other cause not itself compensable is aggravated, prolonged, accelerated, or in any way contributed to by an occupational disease . . . ." Section 39-72-706(1), MCA (repealed 2005).

¶31 On appeal, we held in *Polk*, that the hearings examiner applied the wrong standard of causation by requiring Polk's occupational exposures to be the "major or primary

10

factor causing his medical condition" rather than reviewing the medical experts' testimony to determine whether it supported a finding that an occupational exposure contributed to or aggravated Polk's condition. *Polk*, 287 Mont. at 88, 951 P.2d at 1020. We stated in *Polk* that "an employer accepts his employee with all of his injuries and diseases." *Polk,* 287 Mont. at 84, 951 P.2d at 1018 (citing *Ridenour v. Equity Supply Co*., 204 Mont. 473, 665 P.2d 783 (1983); *Eastman v. Atlantic Richfield Co.*, 237 Mont. 332, 777 P.2d 862 (1989)). And, we held that the proper test for compensability of an occupational disease is "whether occupational factors significantly aggravated a pre-existing condition, not whether occupational factors played the major or most significant role in causing the claimant's resulting disease." *Polk*, 287 Mont. at 85, 951 P.2d at 1018.

¶32 In the instant case, MSF argues that in light of the changes the Legislature made to the laws on occupational diseases in 2005, the *Polk* standard is no longer applicable. MSF maintains that the express language of the post-2005 occupational disease statutes requires that the damage or harm arise out of or be contracted in the course and scope of the claimant's employment which in turn requires the workplace events to be the major contributing cause of the claimant's condition. MSF contends that both Dr. Van Belois and Dr. Schumpert opined that Grande's job as a truck driver was not the major contributing cause of his arthritis.

¶33 While it is true that the Legislature changed the definition of occupational disease after *Polk*, the Legislature did not specify in those changes that an occupational disease is

11

not compensable at all if the underlying cause is a pre-existing condition. As already indicated, the 2009 version of the MCA defines an occupational disease as follows:

> (9) Occupational diseases are considered to arise out of employment or be contracted in the course and scope of employment if:
> (a) the occupational disease is established by objective medical findings; and
> (b) the events occurring on more than a single day or work shift are the major contributing cause of the occupational disease *in relation to other factors contributing to the occupational disease.*
>
> . . .
>
> (13) As used in this section, "major contributing cause" means a cause that is the leading cause contributing to the result *when compared to all other contributing causes.*

Section 39-71-407, MCA (2009) (emphasis added).

¶34 In this case, MSF has not presented any evidence to support its position that the 2005 Legislature intended to revoke statutorily created benefits when it enacted § 39-71-407(13), MCA. In fact, there is nothing in the plain language of § 39-71-407(13), MCA, that precludes compensability of an occupational disease any time there is an underlying or pre-existing cause or disposition toward the condition.

¶35 Had that been the Legislature's intent, it would not have included the language we have italicized above. There is nothing to indicate that the Legislature intended to completely eliminate compensation for an occupational disease when there are congenital factors contributing to it. MSF's position is undermined by § 39-71-407(10), MCA (2009), which provides that the only employer liable for a compensable occupational disease "is the employer in whose employment the employee was last injuriously exposed to the hazard of the disease." This language contemplates that an employer may be liable for an occupational disease even if the employee had the disease prior to working for that

12

employer. MSF seems to acknowledge this by noting in its reply brief that its position is "that preexisting conditions that are substantially and materially aggravated by injuries or occupational diseases remain compensable." MSF takes the position, however, that an individual must *have* an occupational disease before an aggravation of it can be compensable, and thus only occupational factors can be considered in determining whether a condition meets the definition of an occupational disease. This argument overlooks the Legislature's clear expression that *all* contributing factors be considered in determining whether a condition qualifies as an occupational disease. Section 39-71-407(13), MCA (2009).

¶36 Moreover, the fact that the definition of "major contributing cause" is tied to the *result* is significant in light of the evidence presented in this case. Section 39-71-407(13), MCA (2009), does not require the job to be the leading cause of the *onset* of the disease, but the leading cause contributing to the *result,* which in this case is the disease's progression to the point where Grande is unable to work.

¶37 An employer cannot be required to take an employee as he finds him, while at the same time be allowed to ignore the impact of work-related factors on pre-existing conditions. It is only by finding that the statute requires the consideration of pre-existing conditions on the development of occupational diseases that courts can give meaning to the statutory requirement to determine the "major contributing cause" of the claimant's condition.

¶38 MSF also argues that under § 39-71-407(2)(a)(ii), MCA, an insurer is liable only when an *injury* aggravates a pre-existing condition, not when an occupational disease

13

aggravates a pre-existing condition. MSF notes that there was no *injury* in this case. Section 39-71-407(2)(a)(ii), MCA (2009), provides in relevant part:

> (2) (a) An insurer is liable for an injury, as defined in 39-71-119, if the injury is established by objective medical findings and if the claimant establishes that it is more probable than not that:
>
> .  .  .
>
> (ii) a claimed injury aggravated a preexisting condition.

Contrary to MSF's interpretation, § 39-71-407(2)(a)(ii), MCA (2009), is not referring to an insurer's liability for an occupational disease. Instead, by referencing § 39-71-119, MCA (2009) (which defines "injury" and "accident"), this subsection of the statute refers to liability for an injury. Section 39-71-119(4), MCA (2009), excludes from the definition of "injury" a "disease that is not caused by an accident." Liability for an occupational disease, as noted above, is covered by § 39-71-407(8), MCA (2009).

¶39    As the WCC pointed out, although the word "aggravation" does not appear in the statutory definition of "occupational disease," the statutory requirement that the work-related aspect of an occupational disease be the "major contributing cause" would be meaningless if, as MSF argues, permanent aggravations of underlying conditions can no longer be considered occupational diseases even if work-related factors are the major contributing cause of the condition. It is unlikely that the only contributing factor to an occupational disease will be the employee's job duties, and that is precisely why § 39-71-407, MCA, provides that for an occupational disease to be compensable under the WCA, only "the leading cause contributing to the result" must be related to the employment. Moreover, § 39-71-407(13), MCA, requires that the "leading cause" must

14

be compared to "all other contributing causes," and a preexisting condition certainly falls within the ambit of "all other contributing causes."

¶40     MSF argues that in order for Grande's work to be the leading cause of his condition, the occupational factors must weigh heavier than any of the other individual contributors to an occupational disease. The WCC pointed out that just as a horse can "lead" a race by a nose, a "leading cause" under the statute is that cause which ranks first among all causes "contributing to the result"—i.e., the condition for which benefits are sought regardless of the respective percentages of multiple contributing causes.

¶41     Both Dr. Schumpert and Dr. Van Belois acknowledged that the causes of osteoarthritis and rheumatoid arthritis are unknown. Dr. Van Belois testified that the current understanding of the cause of most forms of arthritis is that there may be a genetic component as well as an environmental exposure. She pointed out that with osteoarthritis, the genetic predisposition is triggered by trauma or exposure over time ("wear and tear"), while rheumatoid arthritis is triggered by an environmental agent that is different for each person. Because of the need for a genetic pre-disposition, Dr. Van Belois was unwilling to state that Grande's job duties caused his arthritis. She did state, however, that the repetitive use of his hands for shifting gears, gripping the steering wheel, and twisting hoses on and off accelerated both Grande's osteoarthritis and his rheumatoid arthritis.

¶42     Dr. Van Belois opined that it was more probable than not that Grande's job duties, when compared to all other contributing causes, were the leading cause of the worsening or accelerating of his osteoarthritis because Grande spent most of his time doing his

15

work-related activities repetitively. Dr. Van Belois testified that activities of daily living can aggravate arthritic conditions, but to a lesser degree because individuals can moderate how much time they spend doing those activities in a way that they cannot in a work environment which requires repetitive movement.

¶43 As for Dr. Schumpert, his report is based solely on a review of Grande's medical records. Dr. Schumpert did not examine Grande at the time he wrote his report. In addition, Dr. Schumpert's opinion that the job of truck driver is not prone to aggravate either osteoarthritis or rheumatoid arthritis appears to rely more on the job title of truck driver rather than on the actual duties of Grande's job which included gripping and twisting the caps on and off the valves on the storage tanks and the tanker, and gripping and twisting the hoses on and off of those valves. This is evident from various statements in Dr. Schumpert's report, such as his statement that he was "unable to identify any factor in [Grande's] work as a truck driver that would cause this isolated problem involving the hands."

¶44 Moreover, Dr. Schumpert based his opinion in part on the "lack of any literature supporting aggravation of rheumatoid arthritis by individual's working in the vocation of truck driver." And, he noted that if driving truck could cause rheumatoid arthritis, then "rheumatoid arthritis would be far more prevalent than it is, as there are literally hundreds of thousands of truck drivers in the United States." Clearly Dr. Schumpert focused only on the truck driving portion of Grande's job; he did not take into consideration the other duties Grande was required to perform as part of his job.

16

¶45 As a general rule, the opinion of a treating physician is accorded greater weight than the opinions of other expert witnesses. *EBI/Orion Group v. Blythe*, 1998 MT 90, ¶ 12, 288 Mont. 356, 957 P.2d 1134 (*EBI/Orion Group II*) (citing *EBI/Orion Group v. Blythe*, 281 Mont. 50, 57, 931 P.2d 38, 42 (1997) (*EBI/Orion Group I*)). This Court has held, however, that a treating physician's opinion is not conclusive. " 'To presume otherwise would quash the role of the fact finder in questions of an alleged injury. The [WCC], as the finder of fact, is in the best position to assess witnesses' credibility and testimony.' " *EBI/Orion Group II*, ¶ 13 (quoting *Kloepfer v. Lumbermen's Mut. Cas. Co.*, 276 Mont. 495, 498, 916 P.2d 1310, 1312 (1996)).

¶46 The WCC noted here that, in assigning relative weight to expert medical opinions, it takes into account whether the experts have physically examined the claimant, as well as the expert's background and experience working with the particular disease at issue in occupational disease cases. Thus, the WCC stated in its Findings of Fact, Conclusions of Law and Judgment that, on those bases, it assigned greater weight to Dr. Van Belois' opinions than to Dr. Schumpert's because, unlike Dr. Schumpert, Dr. Van Belois is Grande's treating physician; Dr. Van Belois has physically examined Grande on a number of occasions; and Dr. Van Belois is board-certified in rheumatology.

¶47 We conclude in this case that the WCC's findings of fact are supported by substantial, credible evidence, and that its conclusions of law are correct. Accordingly, we hold that the WCC did not err in concluding that Grande is suffering from a compensable occupational disease arising out of and in the course and scope of his employment.

¶48    Affirmed.

/S/ JAMES C. NELSON

We Concur:

/S/ PATRICIA COTTER
/S/ BETH BAKER
/S/ MICHAEL E WHEAT

Justice Jim Rice concurs in part and dissents in part.

¶49    While I concur with much of the Court's analysis about the parties' arguments, I believe the Court ultimately reaches an incorrect result under the governing statutes.

¶50    Most of the Court's analysis is directed to demonstrating that the 2009 legislative changes did not preclude "compensability of an occupational disease any time there is an underlying or pre-existing cause or disposition toward the condition." Opinion, ¶ 34. With this I agree. Merely because a worker's medical condition pre-exists the subject employment does not prohibit compensability. The pre-condition is a factor in the analysis, but does not end the inquiry.

¶51    Under the statute, the worker's employment must be "the major contributing cause *of the occupational disease* in relation to other factors *contributing to the occupational disease*." Section 39-71-407(9)(b), MCA (emphasis added). Thus, of all the factors that

18

contribute to a worker's medical condition, including the pre-existing nature and extent of the condition, the current work duties must be "the major contributing cause" of the medical condition in order for the condition to be a compensable occupational disease.

¶52 Section 39-71-407(13), MCA, defines the internal phrase "major contributing cause" as "a cause that is the leading cause contributing to the result when compared to all other contributing causes." I believe that the Court, rather than inserting this sub-definition back into the definition of occupational disease in § 39-71-407(9)(b), MCA, instead gives it a separate and inconsistent meaning. The Court reasons that "the result" referenced within this sub-definition is the worker's occupational outcome, here, that "Grande is unable to work." Opinion, ¶ 36. However, a worker's occupational outcome is a disability issue, which is determined later. The provisions at issue here are not addressing disability and do not incorporate a worker's occupational result into the definition of occupational disease. Rather, "the result" referenced here is the current medical condition at issue, to which the definition in § 39-71-407(9)(b), MCA, is applied to determine the compensability of the condition as an occupational disease. Paralleling 407(9)(b), which requires work duties to be the major contributing cause of the occupational disease "in relation to other factors," 407(13) likewise defines the "major contributing cause" to be the leading cause "when compared to all other contributing causes." Together, these provisions define "the major contributing cause *of the occupational disease*," § 39-71-407(9)(b), MCA (emphasis added), and are not addressing an occupational result.

¶53 Thus, for Grande's current condition to be compensable, his work duties must be "the major contributing cause of the occupational disease." However, the Workers' Compensation Court (WCC) did not find this to be so. Crediting the opinion of Dr. Van Belois over the opinions of the other physicians, the WCC noted that Dr. Van Belois' opinion was that "Grande's job duties, when compared to all other contributing causes, were the leading cause of the worsening or accelerating of [Grande's] osteoarthritis." Contrary to statutory requirement that Grande's duties must be the leading cause of his medical condition, the WCC found that the duties were *the leading cause of the "worsening or accelerating"* of his condition. I submit that this analysis failed to satisfy the statutory requirements.

¶54 MSF correctly argues that this outcome improperly returns to the *Polk* standard. *Polk* permitted job-related "aggravations" of occupational diseases to be compensable. *Polk v. Planet Ins. Co.*, 287 Mont. 79, 951 P.2d 1015 (1997). Here, the disease found to be compensable is based on job duties that are merely "the leading cause" of a *worsening* of the condition.

¶55 I would reverse.

/S/ JIM RICE

20